In the Matter of the REINSTATEMENT OF Herbert E. ELIAS, Applicant, to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.

S.C.B.D. No. 3441.

Supreme Court of Oklahoma.

July 19, 1988.

Alan B. Foster, Asst. Gen. Counsel, Oklahoma City, for Oklahoma Bar Assn.

Paul M. Vassar and Cynthia Ferrell, Chandler, for applicant.

LAVENDER, Justice:

Applicant, Herbert E. Elias, was admitted to the Oklahoma Bar Association in 1963. On August 2, 1981 Elias executed his resignation from the Bar Association pending disciplinary proceedings. On August 26, 1982 this Court issued its order approving Elias' resignation. Elias filed petition for reinstatement to membership in the Bar Association and to the practice of law on August 26, 1987. Elias' request

was heard before a trial panel of the Professional Responsibility Tribunal which recommended that his application be granted. General Counsel for the Oklahoma Bar Association opposed the application before the trial panel and before this Court.

In the recent case of *In the Matter of Kamins*,[1] this Court addressed the issue of reinstatement following resignation pending disciplinary proceedings. In *Kamins* we stated:

> In reinstatement proceedings, as in other bar disciplinary matters, this Court does not sit in review of the trial panel's recommendations but instead sits in exercise of its exclusive original jurisdiction in matters involving the licensing of members of the Bar. Although entitled to great weight, the recommendations of the trial panel are merely advisory in nature. The ultimate decision regarding the reinstatement of Kamins rests with this Court. (footnotes omitted)

The Court went on to emphasize that the burden on one seeking reinstatement, as established by Rule 11.4,[2] is a heavy burden, and pointed out that the burden is the same whether the applicant has been disbarred or has resigned pending disciplinary proceedings. Rule 11.4 requires that the applicant prove that his conduct, if readmitted, will conform to the high standards required of a member of the Bar. All feelings of sympathy to the applicant's position are to be disregarded. In assessing the likelihood of the applicant's future good conduct we are to consider the nature of his past transgressions and to consider applicant's attempts to rectify the harm caused by those transgressions. The Court additionally recognized several factors for consideration regarding reinstatements,[3] including: 1) the present moral fitness of the applicant; 2) the demonstrated consciousness of the wrongful conduct and its effect on the profession; 3) the extent of rehabilitation; and 4) applicant's conduct subsequent to the imposition of discipline. The Court then stated:

It is the duty of this Court to review the evidence in relation to these factors and to make a determination based on the Court's primary duty of safeguarding the interests of the public, the courts and the legal profession. In doing so the Court balances the interest of the applicant against the fact that the very nature of the profession places an attorney in a position where an unprincipled person may do tremendous harm to the public and to his clients. It is because of the great potential for harm that the burden on one seeking reinstatement is so great. Where one has shown disregard for the interests which this Court must uphold, so as to necessitate disciplinary proceedings in the first instance, his show on each of the factors to be considered on reinstatement indeed must be, as stated in Rule 11.4, *clear and convincing*. (emphasis original) (footnotes omitted)

## I.

We begin with an examination of Elias' past transgressions. On April 8, 1982 Elias appeared for deposition concerning a number of complaints filed against him in regard to checks drawn on his trust account which had been returned due to "insufficient funds." In the course of the deposition proceedings Elias revealed a course of conduct occurring within the preceding one year period in which Elias had used his personal and trust accounts interchangeably, and, as a result of having to cover for extensive gambling losses, had engaged in a "check-kiting" scheme with a client, David H. Kuykendall, who was at the time serving a ten year suspended sentence under probation. Elias had represented Kuykendall in the proceeding wherein the suspended sentence was imposed. Some of the checks which Elias had delivered to Kuykendall had been negotiated by Kuykendall to third parties who had then had the checks returned to them due to insufficient funds in the account on which they were drawn. It appeared that most of the

---

1. 752 P.2d 1125 (Okla.1988).

2. 5 O.S.1981, Ch. 1, App. 1–A.

3. Quoting *State v. Russo*, 230 Kan. 5, 630 P.2d 711, 714 (1981).

checks had been drawn on Elias' trust account and had been issued to cover gambling debts incurred by Elias.

On July 7, 1982 the Bar Association filed a five count complaint against Elias. The first count of the complaint concerned the relationship between Elias and Kuykendall. This count alleged numerous violations of the Code of Professional Responsibility arising out of the concerted illegal actions engaged in by Elias with a client whom Elias knew to be on probation under a suspended sentence in a felony case. The second count alleged numerous violations of the Code resulting from Elias' actions in "kiting" checks. The third count concerned checks drawn on Elias' trust account and issued in the names of fictitious persons and which Elias had intended for Kuykendall to attempt to negotiate even though Elias knew the trust account contained insufficient funds. Certain of these checks were successfully negotiated by Kuykendall with his bank and as a result the bank was forced to name Elias as a defendant in a civil suit in an attempt to recover the funds paid out. The fourth count also concerned an insufficient funds check drawn on the trust account. This check had been given to an innocent third party who had negotiated the check with her bank. Her bank subsequently sought judgment against both her and Elias. The fifth count alleged that Elias had settled a case and received and negotiated the settlement funds without the knowledge or authorization of his client. The funds were deposited in Elias' account. Elias then made misrepresentations to the client about the funds. When Elias finally paid over funds to the client with checks drawn on his trust account the checks were returned due to insufficient funds.

Elias executed his resignation less than one month after the formal complaint was filed. Several weeks later the Bar communicated the substance of a grievance filed after Elias' resignation. The grievance related that Elias had represented the client (Joe July) in a workers' compensation proceeding and had received money in the case to pay the medical bills. It was alleged that Elias had failed to pay all of the medical bills and that one medical provider was now threatening to sue the client.

The nature of Elias' original transgressions were indeed very serious, involving criminal activity, blatant disregard of the nature of the attorney/client relationship, commingling of clients' funds, conversion of clients' funds and misrepresentations to clients.

## II.

In evaluating the original offense in relation to an application for readmission Rule 11.4 directs that the circumstances of the offense be explored. Both in the original deposition in 1982 and in testimony in connection with the application for readmission now under consideration Elias has offered the same explanation. He has related that he has always had a love of gambling. In the 1980–1982 period he was faced with taking out substantial loans regarding recapitalization of a bank in which he and his ex-wife held stock, as well as substantial claims by the I.R.S. In an attempt to get money to pay these debts Elias began to gamble more and more heavily. Elias entered into an association with Kuykendall which allowed Elias to place more money out on bets. As gambling losses mounted the association with Kuykendall turned more and more to obtaining money "on the float" to finance continuing gambling activities. The gambling losses eventually reached excesses of several hundred thousand dollars. The explanation for the bad checks comes from the losses and from retaliatory actions taken directly against Kuykendall when Elias began to suspect that Kuykendall had cheated him regarding the handling of the gambling funds. Elias characterized his gambling activities at that point in time as being the result of an addiction to gambling.

## III.

We next turn to a consideration of the evidence presented by Elias in support of his application for readmission. Elias testified in the hearings held before the trial panel that he had sought counseling con-

cerning his gambling after his resignation from the Bar. As a result of the counseling Elias cut out all high stakes gambling, and, at the time of the hearings, had quit gambling altogether and had substantially completed the Gamblers Anonymous twelve step program. Elias testified that in the time since his resignation he had managed to pay all of the money due his clients and all of his gambling debts. It appeared that Elias had paid some debts in the interim between filing his application for readmission and the hearings as those debts came to his attention from the Bar Association's investigations. Elias stated that his records had been destroyed in a flood in May 1984 and as a result some debts had been overlooked. The evidence does show that Elias made a very substantial effort to make restitution and to pay all debts. It further appears that all debts had been paid except for a debt on a judgment in favor of a bank which had taken some of Elias' checks and the I.R.S. However, both of these parties appear to have agreed to a payment schedule on the debts owed.

Elias' testimony regarding his past actions does reflect a general understanding of the wrongfulness of his actions although there is exhibited a marked tendency to offer rationalizations for the actions in that Elias believed he was "borrowing" the funds with the belief that he would pay them back when he won. Elias explained that this thinking had been the product of gambling "addiction." The problem here is that Elias' testimony does not clearly indicate that he understands that actions such as those he was involved in degrade not only the individual lawyer but the Bar itself.

The primary issue, however, is whether Elias has presented evidence sufficient to establish clearly and convincingly that his future conduct, if admitted, will conform to the high standards required of a member of the Bar. Here the testimony of Elias regarding the understanding of the wrongfulness of his past actions is only one factor for consideration. Elias has offered testimony to show the great value he places on the law as his personal career. It

is significant that Elias has put great efforts into placing himself in a position to be considered for readmission by making restitution and clearing his debts. It is also significant that Elias clearly recognizes that, if readmitted, any future misbehavior would jeopardize his legal career. Elias here has also submitted extensive testimony regarding his character from a former Oklahoma Supreme Court Justice, from acting District Court Judges and from legal colleagues and associates. Each of these witnesses has testified that in their opinion Elias could and would conform to the standards required for readmission to the Bar. Several of these witnesses also offered observations on what they saw as Elias' successful rehabilitation.

In its brief filed in this Court in response to the report and recommendation of the trial panel General Counsel for the Oklahoma Bar Association argues that the evidence presented does not reflect that Elias is presently possessed of good moral character. General Counsel suggests that several factors suggest the premised lack of moral character. Several of these factors, however, relate to the seriousness of the original misconduct as previously considered. Additionally, General Counsel argues that Elias made deliberate misrepresentations to the Court in his petition for reinstatement in that he stated that he had made restitution in all cases. General Counsel argues that Elias knew that he had not made restitution in all cases. However, the evidence clearly shows that Elias made restitution in all cases brought to his attention by General Counsel's investigations subsequent to the filing of the petition for reinstatement. This would suggest that Elias' representation that he had made restitution in the petition was made in good faith and was limited to the cases where he had been aware restitution had been due.

General Counsel also argues that testimony reflecting that Elias failed to make child support payments during the period when he was paying off gambling debts reflects a lack of present moral fitness. However, Elias testified that at the time

the children had adequate support from their mother and that a main concern in paying the gambling debts was to insure his family's safety. The child support arrearage has since been reduced to judgment and is currently being paid out with current child support payments under an agreement with Elias' ex-wife. This evidence does not appear to detract from Elias' attempt to establish his present moral fitness.

▆▆▆ Two other arguments presented by General Counsel, however, relate to specific incidents which do merit concern. The first of these is Elias' failure to comply with Rule 9.1.[4] Rule 9.1 provides:

When the action of the Supreme Court becomes final, a lawyer who is disbarred or suspended, or who has resigned membership pending disciplinary proceedings, must notify all of the lawyer's clients having legal business then pending within twenty (20) days, by certified mail, of the lawyer's inability to represent them and the necessity for promptly retaining new counsel. If such lawyer is a member of, or associated with, a law firm or professional corporation, such notice shall be given to all clients of the firm or professional corporation, which have legal business then pending with respect to which the disbarred, suspended or resigned lawyer had substantial responsibility. The lawyer shall also file a formal withdrawal as counsel in all cases pending in any tribunal. The lawyer must file, within twenty (20) days, an affidavit with the Commisson and with the Clerk of the Supreme Court stating that the lawyer has complied with the provisions of this Rule, together with a list of the clients so notified and a list of all other state and federal courts and administrative agencies before which the lawyer is admitted to practice. Proof of substantial compliance by the lawyer with this Rule 9.1 shall be a condition precedent to any petition for reinstatement.

**4.** 5 O.S.1981 Ch. 1, App. 1–A.

General Counsel here complains of Elias' failure to file the affidavit referred to in the rule. The testimony indicates that following the deposition in April 1982 Elias decided to take the course of resignation and at that time began to inform his clients of the necessity of obtaining new counsel. At the time the resignation was actually executed Elias had cleared his files of client matters, and thus did not file the affidavit which speaks in terms of taking these actions after the resignation. We find support for Elias' claim that he had exercised considerable care in providing for his clients' interests regarding future representation in the testimony that over the two year period following his resignation Elias received very substantial sums in quantum meruit for work which he had put in on the cases which had been transferred to other attorneys.

Rule 9.1 indicates that it is necessary to present proof of *substantial* compliance as a prerequisite to reinstatement. The clear import of Rule 9.1 is to protect the interests of the clients of an attorney who is being subjected to the denial of his ability to practice law as a result of disciplinary measures. Here it appears that the intent of the rule was served although there was not *literal* compliance with the rule. Although we cannot condone the failure to follow the rule precisely we do find that Elias has demonstrated substantial compliance.

The final issue for consideration, however, appears to raise a serious question about Elias' actions during the period of his resignation. It clearly appears that during April of 1984, in an attempt to obtain a modification of a one-month suspension of his drivers license for excessive points, Elias represented to the Department of Public Safety that he was employed as an attorney. As a result the D.P.S. allowed Elias a hardship modification to allow him to drive during business hours. While Elias did not represent himself as an attorney for the purpose of practicing law,[5] it appears to have been an action taken to secure a per-

**5.** Compare *State ex rel. O.B.A. v. Samara,* 725 P.2d 306 (Okla.1986).

sonal benefit. Elias' only explanation for this event was that there were officers present who had known him as an attorney and his pride prevented his denial of that fact in their presence. While this incident is itself clearly serious, it does appear to be an isolated event within an otherwise clean course of behavior over the course of a five year period.

## IV.

■ Rule 11.5[6] requires the trial panel to make findings on three points in a reinstatement proceeding. Here the trial panel made affirmative findings on all three points and recommended Elias' reinstatement. The first point is whether Elias now possesses the good moral character which would entitle him to admission to the Oklahoma Bar Association. In making an affirmative finding on this point the trial panel, in its findings of fact and recommendation to this Court, reviewed the evidence presented to it in depth, and concluded that it sufficiently demonstrated Elias' present possession of moral character. Here we have previously discussed the evidence presented as we find it to bear on the considerations established in *In the Matter of Kamins*,[7] and also conclude that it is sufficient to clearly and convincingly establish that Elias is presently possessed of the moral character which would indicate that in the future he will conform to the high standards of conduct required of a member of the Oklahoma Bar Association.

Secondly the trial panel found that Elias had not engaged in the unauthorized practice of law during the period of his resignation. On this point Elias presented testimony that he had refrained from any act which might be construed as practicing law. We agree with the trial panel that no issue was raised as to Elias' proof on this point.

Finally the trial panel found that Elias possessed the competency and learning in the practice of law to allow his admission without written examination. On this point

we note that since his resignation Elias has been continuously employed as a law clerk for one of several attorneys. One of these attorneys testified not only as to Elias' character but as to his present legal competency. Elias has also attended various legal training sessions and functions of the local trial lawyers association. The evidence presented indicates that Elias has continued to maintain competency in the law during the period of his resignation.

## V.

On review of the record in this case we find the evidence to clearly and convincingly establish that Herbert E. Elias will in the future conform to the high standards required of a member of the Bar. Herbert E. Elias is therefore *REINSTATED TO MEMBERSHIP IN THE OKLAHOMA BAR ASSOCIATION AND TO THE ROLL OF ATTORNEYS.* This reinstatement however is subject to the payment of costs of this proceeding in the amount of $3,607.92 and to the furnishing of proof that Elias has completed all accrued Mandatory Continuing Legal Education requirements.[8]

DOOLIN, C.J., HARGRAVE, V.C.J., and SIMMS, OPALA, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

---

**6.** 5 O.S.1981 Ch. 1, App. 1–A.

**7.** Supra, note 1.

**8.** See *In the Matter of Essman,* 749 P.2d 103 (Okla.1987).