2007 OK 46

**In the Matter of the REINSTATEMENT OF Robert L. JOHNSTON to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.**

**SCBD No. 5145.**

Supreme Court of Oklahoma.

June 12, 2007.

As Corrected June 13, 2007.

Jack S. Dawson, Oklahoma City, for applicant.

Janis Hubbard, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for respondent.

EDMONDSON, V.C.J.

¶ 1 On October 16, 2000, we granted Robert L. Johnston's application for an order approving his resignation pending disciplinary proceedings following his 1997 conviction on five counts of drug related federal criminal offenses for which he was sentenced to prison for a term of 26 months, followed by a 3 year term of supervised release. We issued an order of interim suspension against Mr. Johnston in June 1997.

¶ 2 This is Mr. Johnston's first attempt at reinstatement. He filed his petition on January 5, 2006, pursuant to Rule 11.1 of the Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A, (RGDP), and hearing was held on April 21, 2006, before a three-member trial panel of the Professional Responsibility Tribunal which heard testimony of Mr. Johnston and six witnesses who testified on his behalf; it received numerous exhibits which were jointly presented, considered the applicable law and heard statements of counsel. No witnesses were opposed to his reinstatement. The Bar Association joined with Mr. Johnston in urging the trial panel to recommend that he be reinstated to the practice of law. The panel concluded that Mr. Johnston had satisfied all the requirements for reinstatement and recommended that his petition should be granted.

¶ 3 The Bar Association and Mr. Johnson have waived their opportunity to present additional briefs here, expressing their mutual opinion that the pretrial submissions, closing arguments of counsel and the trial panel's report more than adequately present the facts and the law and that any additional briefing would not be helpful to the Court.

I.

¶ 4 In bar reinstatement proceedings, as in other disciplinary matters concerning the licensing of attorneys, the Supreme Court does not sit in review of the recommendations rendered by the trial panel of the Professional Responsibility Tribunal; instead, we exercise our original and exclusive jurisdiction by independently reviewing the evidence submitted and applying a de novo standard of review. *Matter of Reinstatement of Page,* 2004 OK 49, 94 P.3d 80, 81. As the ultimate decision regarding reinstatement rests with this Court, the recommendations of the trial panel, although entitled to great weight, are merely advisory in nature. *Matter of Reinstatement of Meek,* 2006 OK 14, 130 P.3d 255; *Matter of Reinstatement of Kamins,* 1988 OK 32, 752 P.2d 1125, 1129.

¶ 5 Rule 11.4 RGDP provides that in reinstatement proceedings the burden is placed on the applicant to show by clear and convincing evidence that his or her application warrants reinstatement. In pertinent part that rule states:

An applicant for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement will be required to

present stronger proof of qualifications than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy towards the applicant must be disregarded.

¶ 6 Rule 11.5 RGDP sets forth three additional specific findings which the trial panel must make before an applicant can be reinstated, namely that the applicant:(1) possesses the good moral character entitling him or her to be admitted to the Oklahoma Bar Association; (2)has not engaged in any unauthorized practice of law during the period of suspension, disbarment or resignation; and (3)possesses the competency and learning in the law required for admission to practice law in Oklahoma.

■ ¶ 7 This Court views applications seeking reinstatement to the practice of law with utmost seriousness and it is our primary duty to safeguard the interests of the public, the courts and the legal profession. Stressing that fact, in *Matter of Reinstatement of Kamins*, 1988 OK 32, 752 P.2d 1125, 1130, we set forth these additional factors for considering evidence presented for reinstatement:(1) the present moral fitness of the applicant; (2) the applicant's demonstrated consciousness of wrongful conduct and the disrepute which that conduct brought to the profession; (3) the extent of applicant's rehabilitation; (4) the seriousness of the original misconduct; (5) applicant's conduct after the resignation; (6) the time which has elapsed since the resignation or discipline; (7) applicant's character, maturity and experience at the time of discipline or resignation; (8) applicant's present competence in legal skills. *Kamins*, at 1130. See also *Matter of Reinstatement of Elias*, 1988 OK 86, 759 P.2d 1021. We also must determine that reinstatement would not adversely affect the Bar and that applicant would not commit any serious crime if readmitted. *Matter of Reinstatement of Cantrell*, 1989 OK 165, 785 P.2d 312, 313; *Matter of Reinstatement of Massey*, 2006 OK 21, 136 P.3d 610, 615.

■ ¶ 8 The burden placed on an applicant seeking reinstatement to the practice of law is a heavy one and it is the same whether applicant was disbarred or resigned from the bar pending disciplinary proceedings. *Kamins*, at 1129; *Matter of Reinstatement of Hardin*, 1996 OK 115, 927 P.2d 545, 546. We have held that a felony conviction is "not tantamount to a death sentence regarding reinstatement of the license to practice law. Rather, each reinstatement decision is determined on a case-by-case basis, carefully weighing all factors." *Matter of Reinstatement of Anderson*, 2002 OK 64, 51 P.3d 581, 583; *Matter of Reinstatement of Wright*, 1995 OK 128, 907 P.2d 1060, 1063. While a felony conviction is obviously a matter of great seriousness and we judge those facts and surrounding circumstances with increased awareness of that seriousness and the disrepute it casts up on the profession, we have recognized that it is possible for one who has committed a felony to show by clear and convincing evidence that he or she can comply with high standards required for reinstatement. *Matter of Cantrell*, 785 P.2d 312; *Matter of Anderson*, 51 P.3d 581; *Matter of Reinstatement of Spilman*, 2004 OK 79, 104 P.3d 576.

■ ¶ 9 Also, reinstatement is not automatically granted upon a *prima facie* showing of applicant's proper conduct following the loss of his or her license to practice, even in the absence of evidence to the contrary. *Matter of Wright*, at 1063.

II

¶ 10 The record shows the following. Mr. Johnston was admitted to the Oklahoma Bar Association in 1978. He began his legal career working for the Oklahoma County District Attorney, after which he worked in the Oklahoma City Municipal Counselor's Office as a police legal advisor and as a municipal prosecutor. Later he was appointed City Attorney of Midwest City. He also worked for different attorneys engaged in general practice. Ultimately he went into private practice on his own, and for many years he primarily concentrated on criminal defense law.

¶ 11 In 1993, a disciplinary action was brought against Mr. Johnston wherein we found the evidence supported the parties'

stipulations of fact and agreed conclusions of law that he had failed to diligently and competently represent and communicate appropriately with his clients, made a false statement to the court and commingled and converted his clients' funds. Recognizing that his misconduct resulted primarily from an "admitted incompetence" in the area and not from bad intentions (he mishandled client's money out of ignorance of proper procedures for trust accounts and his incorrect statement of fact to the judge was not intended to deceive or gain advantage), we adopted the PRT's recommendation that he should be suspended from the practice of law for four months. *State ex rel. Oklahoma Bar Association v. Johnston*, 1993 OK 91, 863 P.2d 1136.

¶ 12 In May 1994, we issued a private reprimand to Mr. Johnston for unprofessional and irresponsible conduct committed during that period of suspension for actions which constituted misrepresenting his status and engaging in the unauthorized practice of law. According to his undisputed testimony before the trial panel, he helped his then girlfriend with a ticket by having a municipal counselor write a recommendation for a fine on back of the ticket which Mr. Johnston then took to the cashier counter and paid for her.

¶ 13 On June 17, 1997, this Court entered an order of interim suspension against Mr. Johnston after he was convicted in the United States District Court for the Western District of Oklahoma of one count of attempting to possess a steroid in violation of 21 U.S.C. § 846, a misdemeanor, to which he entered a plea of guilty; and three felony counts of use of a telephone to facilitate distribution of marijuana in violation of 21 U.S.C. § 843(b) and one felony count of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846, of which he was found guilty after pleas of not guilty. His convictions were affirmed on appeal, *United States v. Johnston*, 146 F.3d 785 (10th Cir.1998), cert. denied, 525 U.S. 1088, 119 S.Ct. 839, 142 L.Ed.2d 694 (1999). He was released from incarceration in April 1999, and his supervised release was completed on April 20, 2002.

¶ 14 In September 2000, in response to our order to show cause why a final order of discipline should not be imposed, Mr. Johnston submitted his affidavit of resignation from the Oklahoma Bar Association pending investigation of a disciplinary proceeding. His affidavit reflected his awareness that in addition to his federal felony convictions, the Bar was investigating allegations of subsequent conduct as proof in support of aggravation of discipline. The Bar Association recommended he be disbarred. This Court entered an order approving his resignation but denying his request to make the resignation effective as of the date of his earlier interim suspension. *State of Oklahoma, ex rel. Oklahoma Bar Association v. Johnston*, 2000 OK 80, 14 P.3d 544.

¶ 15 The Bar Association now advises us that those additional allegations were thoroughly reviewed and resolved at the time of Mr. Johnston's resignation and, therefore, are not set forth for disciplinary review in this reinstatement matter nor to be brought up in another disciplinary complaint.

¶ 16 At the reinstatement hearing before the panel, Mr. Johnston's undisputed testimony concerning the underlying facts that led to the charges against him was consistent with his testimony at trial. He explained that a former client and drug dealer, Richard Jarvis, came to him and asked him to lie to two drug dealers who had threatened to kill him unless he immediately paid a debt from a previous drug transaction. He asked Mr. Johnston to tell the men that he (Jarvis) had been arrested in the hope that the false information would deter them from making further contact with him.

¶ 17 Mr. Johnston did communicate the false story to the drug dealers and they did not contact Mr. Jarvis again. In the process of conveying this information, the federal Drug Enforcement Administration learned of Mr. Johnston's involvement through wiretaps which had been placed on Mr. Jarvis's telephone. Mr. Johnston was indicted on the counts detailed above.

¶ 18 At trial, it was the government's theory that Mr. Johnston's agreement to disseminate the false story was sufficient evidence of

his involvement in the conspiracy to distribute marijuana and that he was shown to have intended to facilitate the commission of a drug felony through the use of the telephone. Mr. Johnston argued that his intent in having those conversations was not to facilitate a drug transaction which had already taken place, but to try to save Mr. Jarvis from harm. The judge and jury agreed with the government, as did the Court of Appeals for the Tenth Circuit which affirmed his conviction. The charge of attempting to possess a steroid came about also by way of an intercepted phone conversation with another client in which Mr. Johnson, a successful amateur bodybuilder at the time, accepted the client's offer of the steroid.

¶ 19 Before the trial panel, Mr. Johnston was very open and forthright about his life and behavior before and during the period in question, during his imprisonment and since his release. He acknowledged that what he did was illegal and wrong and that there were other and better ways in which he could, and should, have handled the situation, but that he did not take the time to think it through and make the right choice.

¶ 20 He believes that since his conviction he has made significant and positive changes in his life and his approach to decision-making is much improved. He testified that he has learned from his mistakes and he believes he is now much more mature, thoughtful and careful. He stated that in the past he was a good person, but he knows that he would often would "fly by the seat of his pants" when making decisions. Also, he considered it significant that he did not have an adequate support group to help him analyze and think through decisions concerning difficult ethical situations, whereas now he does. Now, he said, he takes his time, studies the situation, reads the law and asks questions of others in an effort to make better judgments. (Tr. 142.)

¶ 21 He made no attempt to minimize the seriousness of his actions and accepted full responsibility for them and their consequences, acknowledging that he brought discredit upon the profession by his actions. He stated that while his decision to communicate the false story to the drug dealers in an attempt save Mr. Jarvis's life might appear at first blush to have been the moral thing to do, he realizes that it was wrong and unlawful; and that he now has a greater appreciation for the fact that in the practice of criminal law, a lawyer cannot get too close to his clients or become overly involved in their lives and personal affairs and still stay on the right side of the ethical line.

¶ 22 Since his release from custody, Mr. Johnston has worked for a number of attorneys as a paralegal on a case-by-case basis, and for the last few years he has worked for several lawyers who are in an office-sharing arrangement. He plans to stay with them if he is reinstated. His various duties with them include assisting in interviewing clients and witnesses, helping keep track of witnesses and lawyers in the courthouse, assisting lawyers in analyzing cases and legal issues, researching and writing various legal documents such as memoranda, motions, briefs, and objections, all under supervision by the attorneys.

¶ 23 He believes he has become a much better student of the law. He expressed confidence in his current level of professional competence, which he has achieved by reason of the enormous amount of time he has spent researching and writing on many varied issues for his employers, attending many CLE's and regularly studying bar journals. He expressed his absolute belief that he is fully rehabilitated and he would never again take any action which would embarrass the profession.

¶ 24 A judge of the Oklahoma County District Court testified on petitioner's behalf and stated she sees him quite often in the courthouse performing duties for his attorney employers. She testified Mr. Johnston takes great care to dress casually to be sure people will not think he is a lawyer or think he is acting like a lawyer, that she does not know of any instance where he has been involved in the unauthorized practice of law and that he always behaves in a very professional manner. She stated she had never heard anything negative about petitioner and that because of his demonstrated maturity, emphasis on punctuality and professionalism, his reinstatement would not adversely affect

the bar, but would instead add to its positive image.

¶ 25 The attorney who represented Mr. Johnson at his criminal trial related that when he first read the indictment against Mr. Johnson he had trouble believing that Mr. Johnston's actions, taken in an attempt to try to save someone's life by getting rid of drug dealers, constituted a crime and he thought Mr. Johnston had not realized at the time that his actions were criminal. He stated he had known Mr. Johnston before the criminal action and believed him to be a good criminal lawyer who didn't hesitate to take his clients' cases to trial. He stated Mr. Johnson had matured since his conviction and had become a more serious individual, with improved legal skills and learning, and that he did not believe Mr. Johnston would ever engage in misconduct again.

¶ 26 One of the attorneys who currently employs Mr. Johnston testified that he fully supports his decision to seek reinstatement to the practice of law. He expressed the utmost confidence in Mr. Johnson's legal competence and skills, character and personal attributes, and present ethical and moral fitness. He stated that Mr. Johnston has matured and become more thoughtful and conservative since his conviction, and that he believes he is fully rehabilitated. He is of the opinion that Mr. Johnston is a good person and a good lawyer, a dedicated professional interested in helping people in an ethical manner, and that his reinstatement would benefit the bar. He testified that Mr. Johnson had never identified himself as an attorney or offered legal advice or engaged in the unauthorized practice of law. He stated that he and the other five attorneys in their office—sharing arrangement help and support each other on a daily basis by discussing legal and ethical issues that arise in their cases and how best to resolve various problems; further, that these attorneys also support Mr. Johnston and are glad he intends to stay with them. The witness stated he would like for Mr. Johnston to become his partner if he is reinstated.

¶ 27 Two attorneys who had known Mr. Johnston for many years testified in support of his application and vouched for his present moral and ethical fitness, his good character, his competence and learning in the law, his excellent legal skills, his good reputation in the legal community and his dedication to the profession. They too were of the opinion that he had matured and grown as a person from his experience and that he had been fully rehabilitated. They attested to his shame and embarrassment for the disrepute he had brought upon the profession and his full acceptance of responsibility for his actions. They expressed firm opinions that Mr. Johnston's reinstatement would be a positive step for the bar and that he would never again engage in any misconduct by which he would embarrass himself, his family or the bar association.

¶ 28 The immediate past president of the Oklahoma Criminal Defense Lawyers Association also testified, strongly supporting Mr. Johnson's petition, stating he thought it would be a disservice to the Bar if it were denied. Appearing before the trial panel with the approval of the association's board of directors, he testified that Mr. Johnson is now and has been from the outset of his legal practice, a scholar and a student of the law who has contributed to its development and advancement. He stated that Mr. Johnston is devoted to making sure that the law and the criminal defense system work as they are intended to, and he had always done a good job of taking care of his clients. He related that Mr. Johnston's reputation among members of the criminal defense bar is that of being an intelligent person, a very capable researcher and writer who was a good litigator, and that other lawyers seek his advice because he is knowledgeable and articulate about the law as it applies to criminal defense work.

¶ 29 The witness stated Mr. Johnston's reputation with regard to ethical concerns since his resignation is excellent. The witness related that he had often overheard Mr. Johnston explaining to other lawyers how he had put himself in this situation that led to his trouble and acknowledging his poor decisions and attitude which contributed to it. He believes Mr. Johnston has demonstrated the ability to communicate to other lawyers how very careful they must be in their desire

to help clients with legal problems, and that if he were reinstated he would offer an additional positive contribution to the bar by continuing to educate young lawyers and practitioners that criminal defense work is fraught with ethical dilemmas and potential legal problems. He anticipated that his organization would want to use Mr. Johnston as a speaker in ethical components of CLE programs it sponsors.

¶ 30 The witness recalled that Mr. Johnson's indictment caused an "immense" amount of discussion and debate in the criminal bar, among prosecutors and defense lawyers, as to whether his action, taken to protect a client from harm, was actually a criminal and/or ethical violation.

¶ 31 Ten attorneys, including one who also testified in person, submitted letters on petitioner's behalf urging his reinstatement and vouching for his moral and ethical fitness, his remorse for his misconduct and acceptance of responsibility as well for as his trustworthiness and professional competence.

¶ 32 Additionally, 75 members of the Bar signed a petition in support of Mr. Johnston's reinstatement and stated they believed he is remorseful for his actions and accepts responsibility for them, and that he will be a reliable, responsible, and trustworthy member of the Bar upon his readmission.

¶ 33 Through the General Counsel, the Oklahoma Bar Association submitted to the panel that Mr. Johnston had satisfied all requirements for reinstatement. He stated Mr. Johnston's post-resignation conduct showed he had earned another chance, that he is fully rehabilitated and that his reinstatement would be in the best interests of the Bar. He noted Mr. Johnston sincerely and fully cooperated throughout the reinstatement process during which the Bar had thoroughly investigated his background and found that he had good moral character, there was no indication that he had committed any act which was an unauthorized practice of law, he had taken more than the number of CLE hours annually required for lawyers to maintain their license and he is professionally competent.

¶ 34 General Counsel noted that no objections to Mr. Johnston's reinstatement had been received by the Bar, and in fact the Bar had received a significant amount of sincere and credible support for his application from well-respected, established members. He stressed that Mr. Johnson's offense did not involve theft or neglect or abuse of clients, and that in fact he took the action he did because he thought he was helping a person.

### III.

■ ¶ 35 As we are charged to do, we have reviewed this case on its own merits and particular circumstances and examined the evidence presented thereon. We have considered the facts surrounding his conviction and all the factors required to support a grant of reinstatement which are discussed above. We agree with the Bar Association and the panel that Mr. Johnston presented a strong case in support of his reinstatement, and it is because of the strength of that evidence that we are willing to consider his reinstatement even though his history includes two disciplinary proceedings in addition to his criminal conviction.

¶ 36 Under the particular facts and circumstances put in evidence in this matter, we agree with the recommendation of the Professional Review Tribunal and the Oklahoma Bar Association that this petitioner has satisfied all the requirements for reinstatement and his petition should be granted. Therefore, the Petition for Reinstatement of Robert L. Johnston for reinstatement to membership to the Oklahoma Bar Association and to the Roll of Attorney is GRANTED and petitioner is reinstated to the practice of law in Oklahoma. Costs in the amount of $1,210.18 are to be paid by petitioner within ninety days from the date this opinion becomes final.

¶ 37 EDMONDSON, V.C.J., LAVENDER, HARGRAVE, OPALA, KAUGER, COLBERT, JJ., Concur.

¶ 38 WATT, J., Concur by reason of stare decisis.

¶ 39 TAYLOR, J., Dissenting and joined by WINCHESTER, C.J.

TAYLOR, J., Dissenting and joined by
WINCHESTER, C.J.

¶ 1 I respectfully dissent to the reinstatement of the Respondent. This Respondent has four (4) felony convictions. He has two previous bar disciplinary actions against him resulting in a suspension and a private reprimand. Those disciplinary actions include findings that he made a false statement to the Court and commingled and converted his clients' funds.

¶ 2 The Respondent does not meet, by clear and convincing evidence, the very strict test set out in Rule 11.4 RGDP which requires that "An applicant seeking such reinstatement will be required to present *stronger* proof of qualifications than one seeking admission for the first time" (emphasis added).

¶ 3 How does an applicant with Respondent's record have, by clear and convincing evidence, *stronger* qualifications than one seeking admission for the first time? Which new applicant has weaker qualifications than this Respondent? I seriously doubt that any new applicant has four felony convictions. Would this Respondent, with his felony record, be admitted to the bar if he were a first time applicant? Respondent has not, by clear and convincing evidence, shown himself to have stronger proof of qualifications than a first time applicant.

¶ 4 This Court has an obligation to safeguard the interests of the public and to protect the integrity of the Courts and the legal profession. If Rule 11.4 RGDP is to have any meaning or credibility at all, this Respondent's application for reinstatement should be denied. His qualifications are not stronger than one seeking admission for the first time.