2009 OK 9

**In the Matter of REINSTATEMENT OF Franklin J. PACENZA, to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.**

**SCBD No. 5432.**

Supreme Court of Oklahoma.

Feb. 10, 2009.

Franklin J. Pacenza, Cleveland, OK, Pro se.

Mark A. Davidson, Assistant General Counsel, Oklahoma City, OK, for Complainant.

## PER CURIAM:

¶1 On June 13, 2006, we suspended the attorney for two years and one day for his dishonest, fraudulent, deceitful, and misleading actions in a real estate transaction resulting in significant economic harm, embarrassment to the legal profession and to this Court, and an undermining of public confidence in the Bar Association and its members. We deemed the extended suspension appropriate based on Pacenza's disciplinary history, discipline administered in similar cases, and the attorney's unwillingness to acknowledge his wrongdoing.[1]

¶2 Upon a *de novo* review,[2] we determine that the attorney did not present clear and convincing evidence that, if readmitted, his conduct would conform to the high standards required of a member of the Bar Association.[3] Therefore, we deny reinstatement and impose the costs of the proceeding in the amount of $2,714.63.[4] Our decision is supported by the attorney's continued lack of understanding of the consequences of his actions leading to suspension and any true

remorse for the results of his conduct along with testimony from former colleagues and a judicial officer questioning both his legal abilities and his integrity and by uncertainty concerning his competency to practice law raised by the lack of strict compliance with the rules governing suspension and reinstatement proceedings.

## FACTS RELEVANT TO REINSTATEMENT PROCEEDINGS

¶3 Pacenza was admitted to the practice of law on October 7, 1976. Before the incident resulting in his suspension for two years and a day, he was disciplined on two occasions. The attorney was privately reprimanded by this Court in October of 1987 for engaging in conduct involving misrepresentations and deceit arising from his collusion in removing a client's child from the lawful custody of the minor's father and transporting the mother and child from Texas to Oklahoma. On February 24, 1989, the Professional Responsibility Commission administered a private reprimand for misrepresentations he made to a social worker at the Oklahoma Department of Human Services that he had filed suit on behalf of an individual and expected to settle the suit within six months. No lawsuit had been filed and the attorney was aware that there was no settlement forthcoming.

¶4 The transaction leading to his suspension occurred in 1999 when the Richards executed a contract for deed to purchase real

1. *State ex rel. Oklahoma Bar Ass'n v. Pacenza,* 2006 OK 23, ¶2, 136 P.3d 616.

2. *In re Reinstatement of Otis,* 2007 OK 82, ¶7, 175 P.3d 357; *In re Reinstatement of Massey,* 2006 OK 21, ¶12, 136 P.3d 610; *Matter of Reinstatement of Blevins,* 2002 OK 78, ¶3, 59 P.3d 510.

3. Rule 11.4, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A providing: "An application for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement

proceedings shall be on the applicant. An applicant seeking such reinstatement shall be required to present stronger proof of qualification than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applicable, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel on an application for reinstatement. Further, if applicable, the Trial Panel shall satisfy itself that the application complied with Rule 9.1 of these rules." *Matter of Reinstatement of Katz,* 1995 OK 115, ¶20, 907 P.2d 1029.

4. Rule 11.1, Rules Governing Disciplinary Proceedings, see note 13, infra.

property from the attorney. At that time, Pacenza did not disclose: the existence of $300,00.00 in IRS tax liens against the property; title problems existing as a result of an incomplete foreclosure action; or that the couple could only expect a merchantable title upon the payment of cash in hand to the attorney. For a period of approximately nine months, Pacenza represented to the Richards and to attorneys hired to assist them that he was working on clearing title to the property. During this period, the attorney did nothing to remedy the title problems.

¶ 5 Once the Richards sought independent legal advice, Pacenza attempted to force the couple into a settlement of $55,000.00. The attorney advised the couple's lawyer that if they did not take his offer, he would obtain a divorce to protect his assets. The settlement offer was refused; and Pacenza followed through with his threats, divorcing his wife in order to preserve assets of his estate.[5] The Richards estimated their total out of pocket expenses at $116,265.25. By the conclusion of the bankruptcy proceedings, the couple received between $39,000.00 and $40,000.00, leaving them with a loss in excess of $75,000.00. Pacenza was able to purchase many of the items sold in the bankruptcy proceedings, including the building where his law office was located; and, he and his wife remarried.

¶ 6 On July 28, 2008, Pacenza filed for reinstatement pursuant to Rule 11, Rules Governing Disciplinary Proceedings, 5 O.S. 2001, Ch. 1, App. 1–A. The hearing on rein-statement was held before the trial panel on October 14, 2008. The trial panel issued its report on November 12, 2008 determining that Pacenza had not met the burden of proof for reinstatement and recommending that reinstatement be denied and costs be imposed. On the same day, the Bar Association filed an application for the assessment of costs in the amount of $2,714.63. The order setting a briefing schedule issued on November 13, 2008. On December 9th and 15th, respectively, Pacenza and the Bar Association filed waivers of their rights to file briefs in the cause.

### JURISDICTION, STANDARD OF REVIEW, AND BURDEN OF PROOF

¶ 7 It is this Court's nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law. The duty is vested solely in this department of government.[6] Our determinations are made *de novo*.[7] Although given great weight,[8] neither the finding of facts of the trial panel nor its view of the evidence or the credibility of witnesses bind this Court. The recommendation is merely advisory.[9] We are bound neither by its findings nor its assessments as to the weight or credibility of the evidence.[10] A thorough and complete exploration of all relevant facts is mandatory in consideration of matters to regulate the practice of law and legal practitioners.[11] Attorneys suspended for disciplinary reasons

5. Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza testifying in pertinent part at p. 132:
"... Q. My question is, was one of the motivations for this divorce proceedings to preserve assets?
A. Yes, it was...."

6. Title 5 O.S.2001 § 13; *State ex rel. Oklahoma Bar Ass'n v. Farrant*, 1994 OK 13, ¶ 13, 867 P.2d 1279; *Tweedy v. Oklahoma Bar Ass'n*, see note 11, infra.

7. *In re Reinstatement of Otis*, see note 2, supra; *State ex rel. Oklahoma Bar Ass'n v. Hulett*, 2008 OK 38, ¶ 4, 183 P.3d 1014; *Matter of Reinstatement of Jones*, 2006 OK 33, ¶ 7, 142 P.3d 380; *Matter of Reinstatement of Massey*, see note 2, *Matter of Reinstatement of Blevins*, see note 2, supra.

8. *In re Reinstatement of Holden*, 2003 OK 28 ¶ 5, 66 P.3d 416; *Matter of Reinstatement of Kamins*, see note 9, infra.

9. Rule 6.15, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Besly*, 2006 OK 18, ¶ 2, 136 P.3d 590; *Matter of Reinstatement of Rhoads*, 2005 OK 53, ¶ 2, 116 P.3d 187; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2003 OK 56, ¶ 2, 71 P.3d 18; *Matter of Reinstatement of Kamins*, 1988 OK 32, ¶ 18, 752 P.2d 1125.

10. *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262.

11. *Tweedy v. Oklahoma Bar Ass'n*, 1981 OK 12, ¶ 4, 624 P.2d 1049.

will not automatically be reinstated on a *prima facie* showing that the attorney has not engaged in improper conduct during the suspension period.[12]

¶8 A suspension from the practice of law for a period of two years and one day is tantamount to disbarment in that the suspended lawyer must follow the same procedures for readmittance as would a disbarred counterpart.[13] Before an attorney who has been disciplined for more than two years may be readmitted to the practice of law, it must be established that the lawyer's conduct will conform to the high standards required of a member of the Oklahoma Bar. The burden is on the applicant to demonstrate by clear and convincing evidence that the prerequisites for reinstatement are satisfied.[14] The applicant must present stronger proof of qualifications than one seeking first time admission.[15]

■■■ ¶9 Rule 11.5, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A requires the trial panel to make specific findings regarding whether: 1) the petitioner possesses the good moral character which would entitle him to be admitted to the Bar Association; 2) the petitioner has engaged in the unauthorized practice of law during the

period of suspension; and 3) the petitioner possesses the competency and learning in the law required for admission to the practice of law in the State of Oklahoma. In addition, this Court considers the following eight factors in making a reinstatement decision: 1) the applicant's present moral fitness; 2) demonstrated consciousness of the conduct's wrongfulness and the disrepute it has brought upon the legal profession; 3) the extent of rehabilitation; 4) the original misconduct's seriousness; 5) conduct after resignation; 6) time elapsed since the resignation; 7) the applicant's character, maturity, and experience when suspended; and 8) present legal competence.[16] Each reinstatement decision is determined on a case-by-case basis, carefully weighing all factors.[17]

## ¶10 a. The attorney has not demonstrated the clear and convincing evidence necessary for his readmittance to the practice of law in Oklahoma.

¶11 Pacenza did not submit a brief arguing his position, but we assume that the attorney would assert that he has met all requirements for reinstatement; or, he would not have sought such by the filing of a

12. *Matter of Reinstatement of Pierce*, 1996 OK 65, 919 P.2d 422; *Matter of Reinstatement of Cantrell*, see note 47, infra; *Application of Sharpe*, 1972 OK 92, ¶7, 499 P.2d 406;

13. Rule 11.1, Rules Governing Disciplinary Proceedings, 5 O.S. Supp.2002, Ch. 1, App. 1–A providing in pertinent part:
"A person whose name has been stricken from the Roll of Attorneys for non-payment of dues, or who has been suspended from the practice of law for a period of longer than two (2) years or disbarred, or who has resigned membership in the Association may be readmitted to the practice of law only through the following procedures:
(a) The applicant shall file an original and ten copies of a petition for reinstatement with the Clerk of the Supreme Court, and attach thereto (1) an affidavit showing all of the applicant's activities since the termination or suspension of his right to practice law and the applicant's place or places of residence since that date; and (2) the applicant's affidavit and the affidavits of the court clerks in the several counties in which he has resided, establishing that the applicant has not practiced law in their respective courts since the termination or suspension of his right to practice law. . . .

(c) The applicant shall pay a fee to cover the expenses of investigating and processing the application as determined by the Professional Responsibility Tribunal. In addition, the applicant shall pay the cost of the original and one copy of the transcript of any hearings held in connection with the application. . . ."
*Oklahoma Bar Ass'n v. Pacenza*, see note 1, supra.

14. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 3, supra; *Matter of Reinstatement of Jones*, see note 7, supra.

15. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 3, supra; *In re Reinstatement of Fraley*, 2005 OK 39, ¶37, 115 P.3d 842.

16. *In re Reinstatement of Otis*, see note 2, supra; *Matter of Reinstatement of Blevins*, see note 2, supra; *Matter of Reinstatement of Kamins*, see note 9, supra.

17. *In re Reinstatement of Page*, 2004 OK 49, ¶3, 94 P.3d 80; *In re Reinstatement of Anderson*, 2002 OK 64, ¶4, 51 P.3d 581; *Matter of Reinstatement of Cantrell*, see note 47, infra.

petition and participation in reinstatement proceedings. The trial panel found that Pacenza had not submitted credible evidence of his good moral character or that, if readmitted, he would conform his conduct to the high standards expected of members of the legal profession in Oklahoma. Specifically, it determined that the attorney was not truly remorseful for his actions and did not understand their gravity nor did he acknowledge the effect of his actions on the public and his clients. Nevertheless, the trial panel did believe that Pacenza had met the burden of proof on the issue of his learning and competence in the law. Both the trial panel and the Bar Association recommend that we deny reinstatement and impose costs of the proceeding. We agree with these recommendations. However, unlike the trial panel, we are not persuaded that Pacenza met the burden of proof as it relates to his competency to practice law. Our lack of confidence in the attorney's legal abilities arises from his failure to strictly comply with the rules governing suspension and reinstatement proceedings.

¶ 12 **1) Pacenza failed to demonstrate true remorse for the damage he caused his clients and to recognize that they have not been fully reimbursed economically.**

■ ¶ 13 Both the Richards appeared to testify against readmitting the attorney to the practice of law. Their general purpose in doing so was an attempt to keep the same harm Pacenza inflicted upon them from happening to anyone else.[18] The first time that the attorney contacted the Richards to express his regrets for the treatment they suffered at his hands was the day of the reinstatement hearing. Although those apologies appear on the record, the candor of the attorney's statements do not comport with the tone of questioning he utilized with the couple. In cross examination, Pacenza was far more interested in attempting to show that the couple had not been injured to the extent they claimed, approximately $75,000.00,[19] than he was to demonstrate that he had done anything to ease their losses.[20] Although the attorney testified that not a day

18. Transcript of Reinstatement Hearing, October 14, 2008, Christina Richards testifying in pertinent part at p. 141:
"... Q. Why are you here today?
A. We believe that—that what happened to us should not happen to anyone else and the hardships that we faced should not have came from an attorney, should not have came to—to anyone who has taken an oath to repre—represent the people and represent the United States and we believe that anything that we can do future wise, to let the courts know what has happened to us, would—would be a big help, so that nobody else has to go through this...."

19. See, ¶ 5 and accompanying footnotes, supra.

20. Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza in cross examination of Christina Richards providing in pertinent part:
at pp. 156–57 "... Q. So it's you testimony the house is worth $116,265?
A. I would believe it's worth more....
Q. So you had a house that you thought was worth 116,000 and you entered into a contract to sell it for 70,000?
A. Yes, sir, because of the situation that we were in, that's the reason why Hattie Birchfield was excited to buy it, that we were selling it at such a low cost, because we were in a situation where we needed a quick sell...."
at p. 159 "... Q. I mean, you could have gone to trial and if you had won the trial you would-

may have won significantly more money against me than you settled for, is that correct?
A. Right. I believe though that I was—I was advised at that time that because you were in bankruptcy court, that you were—you were losing everything, so it was best to take—take the bird in hand is what they had said to us.
Q. You didn't have to make a settlement, did you?
A. At the time, yes, sir, we did. We weren't able to—to do anything else in our financial situation...."
Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza cross examination of Eric Richards providing in pertinent at pp. 195–96:
"... Q. Exactly how much were you out?
A. 116,000, sir.
Q. And how do you remember that and not remember the $4,700 that I loaned to you in cash?
A. I believe it's in writing, sir.
Q. Now, were you going to sell the house for $116,000?
.... A. We were to sell it for more, but because of your delays, sir, we had to drop the price.
Q. Did you have it—an offer on it for more than $116,000?
A. We did have some people interested, yes, sir.
Q. That's not what I asked. Did you have an offer? I'm asking a simple question. Did you have an offer on it?

had gone by since his suspension that he did not feel remorse for the pain he had caused the Richards and the disrepute he brought on the profession, when asked how he would characterize his punishment, Pacenza testified that the discipline imposed for his involvement with the Richards was "excessive" and "harsh." [21]

¶ 14 In his opening statement, Pacenza expressed that he had done everything in his power to make the injured parties whole.[22] This statement, in itself, is misleading. The record is devoid of any indication that the Richards ever received anything from the attorney other than the original settlement monies disbursed in the bankruptcy proceedings. It appears that the attorney believes that the settlement reached in bankruptcy constituted full restitution for his wrongs.[23]

■ ¶ 15 Making full restitution to a lawyer's victims will neither preclude discipline nor insure reinstatement.[24] Nevertheless, the lack of any attempt at restitution is germane to a reinstatement proceeding.[25] This Court's concern is heightened when an attorney takes the position that no further restitution is necessary where it is obvious that the monetary position of a client has not been fully restored.[26] Undoubtedly, the Richards entered a settlement agreement whereby they accepted substantially less than they lost in the real estate transaction with Pacenza, releasing any legal right to pursue full restitution from the attorney. However, a settlement netting approximately $40,000.00 does not constitute full restitution for a loss in excess of $116,000.00. The Richards have not been "made whole" and any contention to the contrary is unconvincing to this Court and demonstrative of the attorney's continued lack of understanding of the harm his actions caused.

¶ 16 **2) Evidence of Pacenza's good work in his church and in his community is insufficient to overcome testimony from former colleagues and a judicial officer questioning both his legal abilities and his integrity.**

■ ¶ 17 During the reinstatement hearing, the attorney called four individuals.

---

... A. I believe there were two people interested in the house, sir...."

**21.** Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza testifying in pertinent part at p. 103:

"... Q. Do you think that the Supreme Court's suspension of two years and a day was excessive?
A. Sure, I'm an attorney by training and I've learned, in 30 years, that you accept the judgments of the Court and move on....
Q. Okay. You've never told anyone you thought it was harsh or excessive?
A. I thought it was harsh in that the Trial Panel recommended six—six months, and when I got from the Trial Panel to the Supreme Court, it multiplied by four times, so I was pretty devastated by that and—and in that regard, I thought it was harsh ..."
Transcript of Reinstatement Hearing, October 14, 2008, Sharon Orth testifying in pertinent part at pp. 311–12:
"... Q. ... What did he have to say for himself when—particularly, when you asked him the question Mr. Pacenza, why do you want to be reinstated to practice law? What did he say?
A. Well, I asked him—well, first of all, I asked him why do you want to practice law again? And he said that he felt he had always done good for people and thought he was well-respected in his community.
Then I asked him why did he think he should be reinstated and he said to me that he thought he got a harsh sentence, that he had served his disciplinary punishment, he had done everything he was supposed to, he had maintained his proficiency in law, he had continued to receive the Bar Journal...."

**22.** Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza in his opening statement at p. 10:

"... MR. PACENZA: ... I've done everything in my power to—to rectify the situation, to make full the parties that were harmed...."

**23.** Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza testifying in pertinent part at p. 68:

"... I tried to do everything I could in my power to right the wrongs I've done. It was my understanding that entered into a full and complete and final settlement with the complaining witnesses here. And, in fact, they wrote a letter to the bar association to that effect, that we had made a complete and final settlement...."

**24.** *In re Reinstatement of Otis*, see note 2, supra; *Matter of Reinstatement of Massey*, see note 2, supra.

**25.** *Matter of Reinstatement of Bradley*, 1993 OK 107, ¶ 8, 897 P.2d 243.

**26.** *In re Reinstatement of Otis*, see note 2, supra.

Two of these individuals were not listed as witnesses but were allowed to make narrative statements. Only one of the four witnesses was a lawyer familiar with Pacenza's legal practice. He testified that the attorney had given him excellent assistance in research of a complicated medical malpractice case during his suspension. He also stated that Pacenza was considered a very ethical and decent person in the community. The two individuals allowed to make narrative statements were adamant that Pacenza is a good man who does extensive work in his church, ministers to shut-ins in the local rest homes, and is a solid contributor to the well being of the community as a whole. Also included in the record are eight letters from members of the legal and church community which strongly urge reinstatement.

¶ 18 The President of the Pawnee County Bar Association, Patrick Pickerill (Pickerill),

testified that he began receiving telephone calls and letters from other attorneys in his community opposing Pacenza's reinstatement even before he read the notice of the filing of the petition in the Bar Journal. Recognizing that he has had personal differences with Pacenza in the past,[27] Pickerill testified that the attorney did not possess the character and knowledge necessary to practice law [28] and that he lacked candor with his clients.[29] Pickerill also stated that he believed it would be a detriment to the law and to the legal profession if Pacenza was allowed to practice law again.[30]

¶ 19 Another lawyer testified that he became involved in a cause in which Pacenza had been the attorney of record in a guardianship and adoption case in which the father's parental rights had been terminated and an adoption had been allowed, all without notice to the father.[31] The lawyer was suc-

27. Transcript of Reinstatement Hearing, October 14, 2008, Patrick Pickerill testifying in pertinent part at p. 216:

"... I've tried, as a Christian—it's no secret that Mr. Pacenza and I have never seen eye to eye from the very beginning of our period of time to practice in the same town...."

28. Transcript of Reinstatement Hearing, October 14, 2008, Patrick Pickerill testifying in pertinent part at p. 214:

"... Q. And what is that opinion?
A. My opinion is that Mr. Pacenza lacks the most important character that every attorney must have. The character that Mr. Pacenza lacks is humility....
... He has never believed that the rules of the Court, that the rules of the law apply to him. He has never demonstrated that he understood that consequences of his actions would affect him. Mr. Pacenza doesn't have the humility to wield the power of an attorney, and yet, not take advantage of his clientele...."

29. Transcript of Reinstatement Hearing, October 14, 2008, Patrick Pickerill testifying in pertinent part at p. 217:

"... Q. Now that's with respect to his moral character. Do you have an opinion with respect to his competency and learning in the law? In other words, has there ever been a time where you've inherited a case of his and have learned that it was not done correctly, would be an example.
A. Yes. On several occasions, I've inherited cases or had to reform cases where certain notices were not given. I recall, at least two or three occasions, where severance of joint tenancy in real estate had occurred and no

required estate tax exemption had been—a release had been filed. These types of things. I've witnessed Mr. Pacenza speak untruths to his clients before...."

30. Transcript of Reinstatement Hearing, October 14, 2008, Patrick Pickerill testifying in pertinent part at pp. 216–17:

"... The last two years during Mr. Pacenza's suspension, practice of law in Pawnee County has gone very smoothly. There is generally an increase in the public's outlook and attitude towards attorneys.
And I believe, with all my heart, that if Mr. Pacenza is readmitted into the bar association, he will begin his practice again in Pawnee County in the same office that he was, which still remains vacant, and that everything that was will be again.
I don't believe that the lessons that should have been learned by Mr. Pacenza can be learned. And it will be a detriment to the citizens of Pawnee County, to the bar association of Pawnee County if the Oklahoma Bar Association allows Mr. Pacenza to practice law there again...."

31. Transcript of Reinstatement Hearing, October 14, 2008, Samuel Douglas Withiam testifying in pertinent part at p. 234:

"... Q. And who was their attorney again?
A. Mr. Pacenza....
A. As I looked deeper into the situation and reviewed the pleadings that were at hand, reviewed the statute, reviewed some of the pertinent case law that was involved, I realized that the processes that were left out of the adoption were all of the required notice requirements to

cessful in having the father's parental rights reinstated. When asked if he would support Pacenza's readmission to the practice of law, he responded that he could not make such a recommendation.[32]

¶ 20 Pacenza listed several judges as potential witnesses. Most of those listed were ambivalent about the reinstatement either stating that they did not have a lot of contact with the attorney when practicing or that they simply had no knowledge of his having engaged in the unauthorized practice of law during his suspension. Nevertheless, the Bar Association's investigator spoke to one judge who stated that he did not support reinstatement because he did not believe the attorney to be trustworthy.[33]

> the father and it didn't appear to be a mistake. It appeared to have been done-enough of them were gone that I felt like that was fraud....."

**32.** Transcript of Reinstatement Hearing, October 14, 2008, Samuel Douglas Withiam testifying in pertinent part at p. 251:

> "... Q. (By Mr. Davidson) based upon your representation to the Sissoms in this fraudulent guardianship and adoption of their child, do you have an opinion as to whether or not Mr. Pacenza possesses good moral character that would entitle him to reinstatement?
> A. The only thing that I have to base that on is this case and what I saw in the file and based on what I saw, I would certainly not recommend that...."

**33.** Transcript of Reinstatement Hearing, October 14, 2008, Sharon Orth testifying in pertinent part at pp. 295–96:

> "... Q. When you say Judge Henry, are you talking about Matthew Henry?
> A. Matthew Henry, yes, sir.
> Q. And what else did you learn? .
> A. When I spoke with him—first of all, as I said, he was not aware he had been listed as a witness.
> Judge Henry did say, quite readily, that he did not support the reinstatement of Mr. Pacenza. He said he didn't think Mr. Pacenza was trustworthy based on some phone calls that Judge Henry had received some time ago, he estimated probably sometime after the suspension and these were from criminal defendants that would need a continuance or some other assistance from the court and they would say to Judge Henry, well, Frank told me to call and say this or that, whatever it was...."

**34.** Transcript of Reinstatement Hearing, October 14, 2008, Sharon Orth testifying in pertinent part at p. 298–99:

¶ 21 The District Attorney of Pawhuska County stated that he did not believe Pacenza could be trusted and that he hoped he would not be reinstated.[34] In contrast, the District Attorney of Creek County said he thought the attorney was aggressive and conscientious in the representation of his clients but expressed no opinion on reinstatement.[35]

¶ 22 The statements from the attorney's witnesses are insufficient to demonstrate clear and convincing evidence [36] of either Pacenza's good moral character or his competency in the law when compared with the strength of contrary evidence elicited by the Bar Association. They do not produce in this Court's collective mind a firm belief or conviction [37] that: the attorney understands the extent of his wrongdoing; he is truly

> "... Q. Larry Stuart, D.A. of Pawhuska, did you visit with him?
> A. I did.
> Q. And what did you learn?
> A. Again, he was not aware that he'd been listed as a witness for Mr. Pacenza. He told me that he had known Frank for quite a few years, that they had been assistant D.A.s together in Osage County, I believe. They had actually run against each other for D.A. and Mr. Stuart had won that race.
> He said he did not feel that Mr. Pacenza could be trusted and he hopes that he was not reinstated...."

**35.** Transcript of Reinstatement Proceedings, October 14, 2008, Sharon Orth testifying in pertinent part at p. 299:

> "... Q. And did you visit with Max Cook, the D.A. of Creek County?
> A. I did, yes.
> Q. And what did you learn there?
> A. He said he had limited experience with Mr. Pacenza. In his opinion, Mr. Pacenza was aggressive and conscientious in representing his clients. That most of the time, he used good judgment. Said he hadn't seen Mr. Pacenza for two or three years and really had no opinion one way or the other about his reinstatement...."

**36.** Rule 11.4, Rules Governing Disciplinary Proceedings, see note 3, supra; *Matter of Reinstatement of Jones*, see note 7, supra.

**37.** Clear and convincing evidence, warranting reinstatement to the bar, is that measure or degree of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re Reinstatement of Massey*, see note 2, supra; *State ex rel. Oklahoma Bar Ass'n v. Green*, 1997 OK 39, ¶ 5, 936 P.2d 947.

remorseful for his actions; or he possesses the good moral character necessary in one licensed by this body to practice law.

¶ 23 **3) The attorney's failure to strictly comply with the rules governing suspension and reinstatement proceedings militates against a finding of knowledge of the law and competency in its practice.**

■■ ¶ 24 Pacenza filed for reinstatement pursuant to Rule 11, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A. However, his petition did not conform strictly to the requirements of the rule. Rule 11.1, Rules Governing Disciplinary Proceedings, 5 O.S. Supp.2002, Ch. 1, App. 1–A requires that affidavits be attached to the petition showing all the applicant's activities and places of residence since suspension along with an affidavit of the applicant and of all court clerks in counties in which the appli-

cant resided establishing that there has been no unauthorized practice of law during the suspension.[38]

¶ 25 The three documents attached to the application did not conform with the statutory requirements for affidavits. In one instance, the document denominated as an affidavit was not signed. None of the three supposed affidavits indicated they were signed before an individual authorized to administer oaths nor did they contain a statement indicating they were being signed under penalty of perjury.[39]

¶ 26 A witness list was attached to the application denominating twenty-seven individuals. When the investigator for the Bar Association made inquiries of these individuals, only nine responded. In addition, it became clear that Pacenza had not contacted all the individuals nor advised them that he would be calling them as witnesses.[40]

---

38. Rule 11.1(a), Rules Governing Disciplinary Proceedings, see note 13, supra.

39. Title 12 O.S.2001 § 422 providing:
"An affidavit is a written declaration, under oath, made without notice to the adverse party."
Title 12 O.S.2001 § 432 providing:
"An affidavit may be made in and out of this state, before any person authorized to administer oaths."
Title 12 O.S. Supp.2002 § 426 providing in pertinent part:
"Whenever, under any law of Oklahoma or under any rule, order, or requirement made pursuant to the law of Oklahoma, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn statement, declaration, verification, certificate, oath, or affidavit, in writing of the person making the same ... the matter may be proved by the unsworn statement in writing of the person made and signed under penalty of perjury setting forth the date and place of execution and that it is made under the laws of Oklahoma...."

40. Transcript of Reinstatement Hearing, October 14, 2008, Sharon Orth testifying in pertinent part:
at pp. 294–95 "... Q. And what did you learn from your conversation with Judge Henry?
A. Well, I called and introduced myself, that I was an investigator and that I was investigating the petition for reinstatement of Mr. Pacenza.
I explained to Judge Henry that he had been listed as a witness and he was somewhat taken aback by that. He wasn't aware that he had been...."
at p. 298–99 "... Q. Larry Stuart, D.A. of Pawhuska, did you visit with him?
A. I did, yes.
Q. And what did you learn?
A. Again, he was not aware that he'd been listed as a witness for Mr. Pacenza....
He said he did not feel that Mr. Pacenza could be trusted and he hopes that he was not reinstated...."
Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza testifying in pertinent part at p. 102:
"... Q. You also have a list of witnesses here on the next page. I believe there's 27 or so witnesses.
A. Uh-huh.
Q. Some of them you've called. Some of them we've gotten letters. Did you speak with each one of these individuals and tell them you would be calling them as a witness?
A. No.
Q. So you didn't talk at all with them?
A. No.
Q. So you don't know if all of them agreed to testify or say something positive about you; is that correct?
A. That's correct...."
Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza testifying in pertinent part at p. 118:
"... MR. GOLDSCHMIDT: You were asked whether you called or contacted each of those people to know if they were going to be a witness.
Does that mean that you didn't call them to be a witness today or did you submit this list and these people didn't know they were on the list?

¶ 27 Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A [41] provides that when a lawyer is suspended there is an affirmative duty within twenty days, to notify all clients *via* certified mail with pending business of the inability to represent them. There is also a requirement to formally withdraw from all pending cases. Finally, during the same twenty day period, the lawyer must file an affidavit with the Commission and with the Clerk of the Supreme Court affirming his compliance with the rule and providing a list of the clients notified along with a summary of all other state and federal courts and administrative agencies before which the lawyer is admitted to the practice of law.

¶ 28 Because he had no pending causes in any court, Pacenza did not file any formal withdrawals after he was notified of his suspension. When asked for evidence that he had contacted all his clients as required upon suspension, the attorney was able to present only twenty-five return receipts although he had a client list of thirty-five individuals.[42]

¶ 29 Every lawyer is charged with the observance of the rules of professional conduct.[43] The lack of knowledge of the rules of professional conduct and disciplinary proceedings raises concerns.[44] While there is no evidence that Pacenza's failure to strictly comply with the rules governing suspension and reinstatement arose from a deceitful motive, it is additional evidence of his lack of knowledge of the rules which govern the practice of law in Oklahoma.

## CONCLUSION

¶ 30 We agree with the trial panel that there is no evidence to indicate that the attorney engaged in the unauthorized practice of law during his suspension. However, although there is testimony in support of Pacenza, the transcript of proceedings before the trial panel makes it clear that the attorney has not demonstrated true remorse for the damage he caused and that he continues to fail to recognize that his clients have not been made whole financially. In addition, we are presented with testimony from the clients harmed by the attorney's actions leading to discipline, by the practicing bar, and by one judicial officer questioning his legal abilities and his integrity. Finally, we are

---

THE WITNESS: They didn't know they were on the list when I submitted it...."

**41.** Rule 9.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A providing in pertinent part:
"When the action of the Supreme Court becomes final, a lawyer who is disbarred or suspended, or who has resigned membership pending disciplinary proceedings, must notify all of the lawyer's clients having legal business then pending within twenty (20) days, by certified mail, of the lawyer's inability to represent them and the necessity for promptly retaining new counsel.... The lawyer shall also file a formal withdrawal of counsel in all cases pending in any tribunal.... Proof of substantial compliance by the lawyer with this Rule 9.1 shall be a condition precedent to any petition for reinstatement."

**42.** Transcript of Reinstatement Hearing, October 14, 2008, Franklin J. Pacenza testifying in pertinent part at:
pp. 82–84 "... Q. Okay. When I count them out, I count 35 clients that you sent certified mailings to; is that correct?
A. Well, you want me to count them? That sounds approximately correct....

Q. Okay. At the request of Ms. Sharon Orth, the investigator of the Oklahoma Bar Association seated here today, you were requested to provide certified mail receipts of the notices that were sent to your clients, is that correct?
A. Yes....
Q. (By Mr. Davidson) Showing you what has been previously marked as Respondent's Number 1 and ask you if you would identify that?
A. Yes. That is the letter I sent to Ms. Orth....
Q. And are there attachments to that?
.... Those are the—the certified mail receipts that we got back that I could find....
Q. Okay. Would you mind counting those, please?
A. 25. My count is 25...."

**43.** *In re Reinstatement of DeBacker*, 2008 OK 17, ¶ 23, 184 P.3d 506.

**44.** *State ex rel. Oklahoma Bar Ass'n v. Wagener*, 2005 OK 3, ¶ 13, 107 P.3d 567; *State ex rel. Oklahoma Bar Ass'n v. Downes*, 2005 OK 33, ¶ 45, 121 P.3d 1058, *rehearing granted, opinion modified* on other grounds (2005).

faced with evidence that Pacenza did not strictly comply with the rules governing either his suspension or his reinstatement.

¶ 31 In making a reinstatement decision, this Court must disregard feelings of sympathy,[45] recognizing that the petitioner's burden of proof is a heavy one.[46] While we are concerned with any adverse effect reinstatement might have on the practicing bar, our foremost consideration is always to protect the public welfare.[47] After having given due consideration to the evidence contained in this record and the appropriate factors examined in reinstatement proceedings, we determine that the petitioner has failed to carry his burden to show by clear and convincing evidence [48] that he is entitled to reinstatement. Therefore, reinstatement is denied and costs of $2,714.63 [49] are imposed.

**PETITION FOR REINSTATEMENT IS DENIED; PETITIONER IS ORDERED TO PAY COSTS.**

EDMONDSON, C.J., TAYLOR, V.C.J., HARGRAVE, OPALA, KAUGER, WATT, WINCHESTER, COLBERT, JJ., concur.

REIF, J., recused.

---

**45.** *Matter of Reinstatement of Page*, see note 17, supra.

**46.** *In re Reinstatement of Hird*, 2008 OK 25, ¶ 3, 184 P.3d 535; *Matter of Reinstatement of Bradley*, see note 25, supra; *Matter of Reinstatement of Kamins*, see note 9, supra.

**47.** *In re Reinstatement of Fraley*, see note 15, supra; *Matter of Reinstatement of Cantrell*, 1989 OK 165, ¶ 2, 785 P.2d 312.

**48.** Rule 11.4, Rules Governing Disciplinary Proceedings, see note 3, supra; *Matter of Reinstatement of Jones*, see note 7, supra.

**49.** Rule 11.1, Rules Governing Disciplinary Proceedings, see note 13, supra.