2009 OK 76

In the Matter of The REINSTATEMENT OF Kwame Telli MUMINA to Membership in The Oklahoma Bar Association and to the Roll of Attorneys.

No. SCBD–5499.

Supreme Court of Oklahoma.

Sept. 29, 2009.

Aletia Haynes Timmons, Timmons and Associates, L.L.C., Oklahoma City, OK, for petitioner.

Loraine D. Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for respondent.

## WATT, J.

¶1 On December 3, 1997, we approved the attorney's voluntary resignation from the Bar Association pending disciplinary proceedings arising from his misappropriation of approximately $50,000.00 in fees belonging to his employer law firm. In July of 2000, Mumina was indicted on twenty counts relating to his actions as trustee of a bankruptcy estate. Nineteen of those counts involved the utilization of over $100,000.00 of bankruptcy funds during 1995 and 1996 for his own purposes. A plea agreement resulted in the dismissal of the first nineteen counts; and the attorney pled guilty to the only remaining count, filing a false report in the bankruptcy proceedings. On January 12, 2009, approximately eleven years after having resigned his office of attorney, Mumina filed a petition for reinstatement.

¶2 Upon a *de novo* review,[1] we determine that the attorney presented clear and convincing evidence that, if readmitted, his conduct would conform to the high standards of a member of the Bar Association.[2] Costs of $2,796.78 are imposed.[3] Our decision to allow Mumina to return to the practice of law

---

1. *In re Reinstatement of Otis*, 2007 OK 82, ¶7, 175 P.3d 357; *In re Reinstatement of Massey*, 2006 OK 21, ¶12, 136 P.3d 610; *Matter of Reinstatement of Blevins*, 2002 OK 78, ¶3, 59 P.3d 510.

2. Rule 11.4, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A providing:
"An application for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the applicant's conduct will conform to the high standards required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, by clear and convincing evidence, in all such reinstatement proceedings shall be on the applicant. An applicant seeking such reinstatement shall be required to present stronger proof of qualification than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applicable, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel on an application for reinstatement. Further, if applicable, the Trial Panel shall satisfy itself that the application complied with Rule 9.1 of these rules."
*Matter of Reinstatement of Katz*, 1995 OK 115, ¶20, 907 P.2d 1029.

3. Rule 11.1, Rules Governing Disciplinary Proceedings, 5 O.S. Supp.2002, Ch. 1, App. 1–A providing in pertinent part:

"A person whose name has been stricken from the Roll of Attorneys for non-payment of dues, or who has been suspended from the practice of law for a period of longer than two (2) years or disbarred or who has resigned membership in the Association may be readmitted to the practice of law only through the following procedures:
(a) The applicant shall file an original and ten copies of a petition for reinstatement with the Clerk of the Supreme Court, and attach thereto (1) an affidavit showing all of the applicant's activities since the termination or suspension of his right to practice law and the applicant's place or places of residence since that date; and (2) the applicant's affidavit and the affidavits of the court clerks in the several counties in which he has resided, establishing that the applicant has not practiced law in their respective courts since the termination or suspension of his right to practice law. The applicant shall concurrently furnish a copy of said petition and all other documents filed with the Clerk of the Supreme Court to the General Counsel of the Oklahoma Bar Association.
... (c) The applicant shall pay a fee to cover the expenses of investigating and processing the application as determined by the Professional Responsibility Tribunal. In addition, the applicant shall pay the cost of the original and one copy of the transcript of any hearings held in connection with the application...."
*State ex rel. Oklahoma Bar Ass'n v. Pacenza (Pacenza I)*, 2006 OK 23, ¶2, 136 P.3d 616.

is supported by: testimony from an elected official, a former federal prosecutor, and two sitting district judges indicating that the attorney's reinstatement would be advantageous to the judicial system, the Bar Association, and his community;[4] the attorney's unqualified acceptance of responsibility for his admittedly wrongful acts;[5] the fact of complete monetary restitution to the victims of his misdeeds and his on-going efforts in meeting his tax obligations; his recognition that he must react differently to the situations causing stress in his life; and his attempts to help young lawyers avoid the pitfalls of his experiences in the practice of law.

### FACTS RELEVANT TO REINSTATEMENT PROCEEDINGS

¶ 3 Mumina was admitted to the practice of law in 1983. On May 5, 1997, the Bar Association filed a three-count complaint against the attorney. All three charges involved Mumina's having misappropriated, for his own use, funds belonging to his employer firm and his dishonesty in responding to firm inquiries about the monies. Count one related to the attorney having accepted a personal check from a client in the amount of $32,500.00 while representing to the firm that he was having difficulty obtaining the attorney fee funds. The second count involved Mumina's having misappropriated $6,843.00 in fees and $1,304.48 in expenses awarded in his law firm's favor contemporaneous with misrepresenting to the firm that there had been no award. Count three described Mumina's having taken $11,870.52 in funds in-

tended for the firm in the form of fees and communicating to the firm that no fees would be paid until some future date when the cause was finally concluded. **Prior to the filing of the complaint, the attorney made full restitution to the firm.[6]**

¶ 4 Mumina's resignation, prompted by the Bar Association's complaint, ended an admirable legal career. Prior to that time, the attorney clerked for a federal bankruptcy judge and had been named as a partner in one firm and as a shareholder in another. He was active in the Bar Association on both a state-wide and county level and instrumental in forming the William J. Holloway, Jr. American Inn of Court which he served as President and Secretary–Treasurer. Contemporary therewith, Mumina was also involved in his local community. Nevertheless, the attorney was experiencing turmoil in his private life. His wife was diagnosed with a life-threatening disease which required her to resign her employment. One of Mumina's children was experiencing significant psychological problems related to the lack of attention she was receiving from her father resulting in an attempted suicide. Finally, the attorney did not believe he was getting the staff support he had been promised at his new firm or that all aspects of his compensation package were being paid at the expected levels.[7]

¶ 5 During the same time period, the attorney learned that he was under investigation for his activities while serving as a bankruptcy trustee. On July 5, 2000, a twenty-count indictment issued. The first nineteen counts

---

4. See ¶ 12 and accompanying footnotes, infra.

5. See ¶¶ 16–18 and accompanying footnotes, infra.

6. Report of trial panel, filed on May 4, 2009, providing in pertinent part at p. 6:

 "... In this case, Mumina made full restitution to the Hall Estill firm of $50,414.54 prior to the initial complaint made to the OBA ..."

7. Exhibit 3, letter from the attorney to the General Counsel dated December 9, 1996 providing in pertinent part:

 "... [F]or purposes of this response, compensation matters were very important and were

stressed during my initial discussions and interviews before joining the firm. It became obvious upon arriving at the firm that all was not what I expected. The staff that I brought with me and I never integrated within the firm and considerable friction occurred almost immediately. Eventually, the staff people would leave the firm and I remained, though feeling isolated and unwelcomed. I joined the firm in April of 1994 and attempted to become a part of the firm that year. However, by year's end an event occurred which became the basis for the developments here. During the evaluation process at year end, the issue of salary and compensation arose and there were serious differences between what I understood the compensation to be and ultimately what it was...."

alleged misappropriation and embezzlement of approximately $115,000.00 belonging to the bankruptcy estate. The final count involved the filing of a false report in the bankruptcy proceedings. **The counts relating to misappropriation and embezzlement were dismissed as part of a plea negotiation after Mumina restored almost $105,000.00 to the bankruptcy estate.**[8] The attorney pled guilty to the single remaining count. On March 7, 2001, Mumina was ordered to pay restitution in the total amount of $35,425.73 and to serve a maximum of twenty-one months imprisonment. **The attorney was released from prison on November 21, 2002 and satisfied the restitution judgment in 2008.**[9] Although the attorney filed personal bankruptcy in 2001, **the record reveals that he is satisfying his delinquent tax obligations to the state and federal governments.**[10]

¶ 6 The reinstatement hearing was held before the trial panel on April 2, 2009. The trial panel issued is report on May 4, 2009 determining that Mumina had presented clear and convincing evidence of all the factors necessary for reinstatement and recommending the same. On the same date, the Bar Association filed its application for the assessment of costs in the amount of $2,796.78. Although Mumina waived the right to file an opening brief, he did file a reply to the Bar Association's response brief. The briefs were filed on April 1, 2009 and May 26, 2009, respectively, completing the briefing cycle.

## JURISDICTION, STANDARD OF REVIEW, AND BURDEN OF PROOF

██ ¶ 7 It is this Court's nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of practitioners of the law. The duty is vested solely in this department of government.[11] Our determinations are made *de novo*.[12] Although given great weight,[13] neither the findings of fact of the trial panel nor its view of the evidence or the credibility of witnesses bind this Court. The recommendation is merely advisory.[14] We are

---

**8.** Exhibit 15, Government's Sentencing Memorandum in Response to Defendant's Objections to Presentence Report acknowledging deposits into the bankruptcy account from Mumina's account made between the months of May and December of 1996 totaling $104,699.

**9.** Exhibit 22, letter from the attorney's parole officers to Mumina dated February 24, 2009 and providing in pertinent part:
"... As requested, this letter should serve as a summary of your federal term of supervised release. You were sentenced on March 7, 2001, to serve a 21–month term of confinement for violation of 18 U.S.C. § 152(2). False statement in relation to a case under Title 11 of the United States Code. The court ordered a two-year term of supervised release to follow and restitution in the amount of $35,425.73. Your term of supervised release commenced on November 22, 2002, and terminated on November 21, 2004. There were no known violations of the terms of supervised release and you presented a cooperative attitude during your term of supervision. According to court records, you satisfied the restitution judgment in November 2008 and the United States Attorney's Office has filed a Satisfaction of Criminal Monetary Penalties...."

**10.** Exhibit 28, Oklahoma Tax Commission Receipt, demonstrates that as late as March 25, 2009, the attorney was meeting monthly obligations for payment of tax balances to the state.

Exhibits 29 and 30, Monthly Statements from the Internal Revenue Service, indicate that Mumina is making payments of $650.00 monthly to satisfy his back federal taxes. Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Mumina testifying in pertinent part at p. 254:
"... Q Do you owe any back taxes?
A I believe I owe some federal taxes, approximately 20 or $12,000 that I've entered into an agreement for payment on installment plan. I believe that my taxes for the state of Oklahoma are current...."

**11.** Title 5 O.S.2001 § 13; *State ex rel. Oklahoma Bar Ass'n v. Combs*, 2008 OK 96, ¶ 11, 202 P.3d 830; *Tweedy v. Oklahoma Bar Ass'n*, 1981 OK 12, ¶ 4, 624 P.2d 1049.

**12.** *In re Reinstatement of Otis*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. Hulett*, 2008 OK 38, ¶ 4, 183 P.3d 1014; *Matter of Reinstatement of Jones*, 2006 OK 33, ¶ 7, 142 P.3d 380.

**13.** *In re Reinstatement of Holden*, 2003 OK 28, ¶ 5, 66 P.3d 416; *Matter of Reinstatement of Kamins*, 1988 OK 32, ¶ 18, 752 P.2d 1125.

**14.** Rule 6.15, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Besly*, 2006 OK 18, ¶ 2, 136 P.3d 590; *Matter of Reinstatement of Rhoads*, 2005 OK 53, ¶ 2, 116 P.3d 187.

bound neither by its findings nor its assessments as to the weight or credibility of the evidence.[15] A thorough and complete exploration of all relevant facts is mandatory in consideration of matters to regulate the practice of law and legal practitioners.[16] Attorneys suspended for disciplinary reasons will not automatically be reinstated on a *prima facia* showing that the attorney has not engaged in improper conduct during the suspension period.[17]

■ ¶ 8 An applicant seeking reinstatement to the practice of law bears a heavy burden which is the same whether the attorney was disbarred or resigned pending disciplinary proceedings.[18] Before being readmitted to the practice of law, it must be established that the lawyer's conduct will conform to the high standards required of a member of the Oklahoma Bar. The burden is on the applicant to demonstrate by clear and convincing evidence that the prerequisites for reinstatement are satisfied.[19] The petitioner must present stronger proof of qualifications than one seeking first time admission.[20] Furthermore, the more severe the disciplinary offense, the heavier the burden the attorney must overcome to gain reinstatement to the Bar Association.[21]

■ ¶ 9 Rule 11.5, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A requires the trial panel to make specific findings regarding whether the petitioner: 1)

possesses the good moral character which would entitle the attorney to be admitted to the Bar Association; 2) has engaged in the unauthorized practice of law during the period of suspension; and 3) possesses the competency and learning in the law required for admission to the practice of law in the State of Oklahoma. In addition, this Court considers the following eight factors in making a reinstatement decision: 1) the applicant's present moral fitness; 2) demonstrated consciousness of the conduct's wrongfulness and the disrepute it has brought upon the legal profession; 3) the extent of rehabilitation; 4) the original misconduct's seriousness; 5) conduct after resignation; 6) time elapsed since suspension; 7) the applicant's character, maturity, and experience when suspended; and 8) present legal competence.[22] Each reinstatement decision is determined on a case-by-case basis, carefully weighing all factors.[23]

## ¶ 10 a. The clear and convincing evidence supports the attorney's readmittance to the practice of law in Oklahoma.

¶ 11 Mumina asserts that he has presented evidence sufficient to satisfy all factors considered in a reinstatement proceeding. The Bar Association's position differs. It asserts that the attorney has failed to present clear and convincing evidence of factors necessary to allow his return to the practice of law in Oklahoma.[24] Specifically, the Bar Association argues that: 1) Mumina failed to present

---

15. *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262.

16. *Tweedy v. Oklahoma Bar Ass'n*, see note 11, supra.

17. *Matter of Reinstatement of Pierce*, 1996 OK 65, ¶ 19, 919 P.2d 422; *Matter of Reinstatement of Cantrell*, 1989 OK 165, ¶ 2, 785 P.2d 312.

18. *Matter of Reinstatement of Jones, II*, 2009 OK 1, ¶ 4, 203 P.3d 909; *Matter of Reinstatement of Blevins*, see note 1, supra.

19. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 2, supra; *Matter of Reinstatement of Jones*, see note 12, supra.

20. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 2, supra; *In re Reinstatement of Fraley*, 2005 OK 39, ¶ 37, 115 P.3d 842.

21. Rule 11.4, Rules Governing Disciplinary Proceedings, see note 2, supra; *Matter of Reinstate-*

ment of Jones, see note 12, supra; *Matter of Reinstatement of Hardin*, 1996 OK 115, 927 P.2d 545.

22. *In re Reinstatement of Otis*, see note 1, supra; *Matter of Reinstatement of Blevins*, see note 1, supra; *Matter of Reinstatement of Kamins*, see note 13, supra.

23. *In re Reinstatement of Page*, 2004 OK 49, ¶ 3, 94 P.3d 80; *In re Reinstatement of Anderson*, 2002 OK 64, ¶ 4, 51 P.3d 581; *State ex rel. Oklahoma Bar Ass'n v. Cantrell*, see note 17, supra.

24. The Bar Association also asserts that the trial panel erred in making the recommendation for reinstatement. Although we agree with the Bar's contention that recommendations from the trial panel are merely advisory and that it remains the responsibility of this Court to make the final determination regarding an attorney's competence to practice law, we do not agree that the

stronger proof of his present moral fitness to practice law than would a first-time applicant for admission; 2) a lack of information exists evincing the attorney's consciousness of his wrongful conduct, the disrepute his actions brought upon the legal profession, and Mumina's rehabilitation; and 3) the severity of the attorney's misconduct both in relation to having mishandled his firm's funds and in having been imprisoned for his actions as a trustee in bankruptcy are sufficient, in and of themselves, to deny reinstatement. We determine that the trial panel's recommendation for reinstatement is meritorious and disagree with the position taken by the Bar Association.

### 1) The attorney presented stronger proof of his present moral fitness to practice law than would a first-time applicant for admission.

 ¶ 12 Fourteen witnesses appeared before the trial panel in support of Mumina's reinstatement. State Representative Mike Shelton (Shelton/Representative) testified that the attorney's earlier misdeeds had not affected adversely the attorney's leadership in the community and that he would have no hesitation in employing him as an attorney. Not only did Shelton provide an unqualified recommendation for reinstatement, he testified that the attorney's inability to practice was a detriment to the Representative's constituents.[25] A retired long-time prosecutor in the United States Attorney's Office for the Western District of Oklahoma stated that he would welcome Mumina's reinstatement and was confident that the attorney would be a valuable contributor to the city, to the judicial system, and to the Bar.[26] Two sitting District Court Judges, with knowledge of both the complaint filed against the attorney and the federal indictment, recommended reinstatement. One of the judges actively encouraged Mumina to seek the same.[27] The

trial panel's decision should be overturned. See ¶ 7 and accompanying footnotes, supra.

**25.** Transcript of Reinstatement Hearing, April 2, 2009, Representative Mike Shelton testifying in pertinent part at pp. 89–90:

"... Q And having been made aware of [Mumina's past history], does it change your opinion of him or his ability to contribute to the community?
A It does not sway my trust, that he's doing the right thing for the community.
Q What about as an attorney? Would you have a problem with him being reinstated to the Bar, knowing what you know?
A No....
Q Can you tell the Panel your personal sense or feelings about Mr. Mumina simply as a person and his general demeanor.
A I think that he's a great person, a very giving person. I think that regardless to any past discretion, I think that he has definitely a—he's remorseful for it and our community is hurt because we don't have—we've missed his—him being in the community as an attorney working for the people in—in our community....
Q Do you have any opinion about whether you would recommend him to reinstatement to the Oklahoma Bar Association?
A No, I think he should be reinstated...."

**26.** Transcript of Reinstatement Hearing, April 2, 2009, John E. Green testifying in pertinent part at pp. 97–99:

"... Q Despite what you know, do you have any reason to believe that he is not of good moral character, fitness to practice law, if he were to be reinstated?
A No, I have no reason. I think that he would be very much a person who could contribute to the system of justice here in this area and in this state....
Q And having prosecuted people and for crimes in federal court, in the U.S. Attorney's Office, you know about his federal indictment, his incarceration and you, despite that, still think that he has good moral character and fitness to practice law. Can you explain why—why you think that?
A. I think that because, first of all, he has—in my views, he has paid whatever infractions that might have been involved with his going to—in the federal penal system and it is my understanding that he voluntarily resigned rather than to face disbarment and have gone through law school, its a tedious—long and tedious study and with all of the background and with the clerkship with Judge Richard Bohanon, who is still a bankruptcy court judge, with all of that information, I mean, experience and all, he's a very bright person. For that reason, he could make some very good contributions to the society, as well as to the legal profession in the promotion of justice.
Q Would you as a member of the Bar, recommend his reinstatement?
A Yes, wholeheartedly I would.
Q And do you have any reason for any concerns whatsoever at this time about that?
A None whatsoever...."

**27.** Transcript of Reinstatement Hearing, April 2, 2009, Judge Tammy Bass LeSure testifying in pertinent part at pp. 268–69:

"... Q And after you looked over that in some detail, do you think, at this time, those things

lawyer for whom Mumina has been doing para–legal work testified that, during the five years of their association, the attorney has been forthright, honest, and completely trustworthy. In addition, the lawyer testified that throughout the same time period, Mumina had demonstrated his fitness, moral character, and competency in the law.[28]

¶ 13 Three attorneys testified against Mumina's reinstatement. Two of the three were members of the firm from which the attorney misappropriated funds and the third was the attorney hired to handle the firm's bar complaint against the attorney. Despite their concerns about reinstatement, one of the attorneys testified that Mumina was one of the most qualified attorneys he had ever encountered.[29] The other stated that he believed that Mumina's actions had been out of character for the attorney and that he had no knowledge of Mumina's present fitness to return to the practice of law.[30] The third witness for the Bar Association was the attorney hired by the firm to prosecute the bar complaint. He took no position on the issue of reinstatement.[31]

should prevent Mr. Mumina from being reinstated to the bar association?
A At the time that those are some actions that he's had to make, you know, pay some amends for, as far as being punished, I do think that it was appropriate at that time.
Right now, I feel as that he has done everything possible to make sure that the wrongs that he's done won't be done again and he's paid his debt to society. He's done everything that, as far as I can see, that the Bar and even society has asked him to do and I wouldn't have any problem in hesitating that he receive his license back again ..."
Judge LeSure did think it might be appropriate to provide some mechanism for the monitoring of the attorney's finances in his practice.
Transcript of Reinstatement Hearing, April 2, 2009, Judge Kenneth Watson testifying in pertinent part at pp. 296–97:
"... Q And can you tell the court a little bit—I mean, the Tribunal and the Court a little bit about that?
A I've seen him on multiple occasions in—at Oklahoma County. I've also seen hin out socially and I've been probably one of many that have encouraged him to apply for reinstatement to the Bar because I think he was a—a fine example of an attorney, in my opinion, and I felt that he had served his time. He had made a mistake and he had paid for it and I thought—I thought that he was—that he should be reinstated and that's why I've encouraged him to do that and that's why I'm here today, because I feel strongly about that...."

**28.** Transcript of Reinstatement Hearing, April 2, 2009, Cynthia Rowe D'Antonio testifying in pertinent part at pp. 36–38:

"... Q And have you found him to be forthright and honest and completely trustworthy?
A Yes. During the time, the five years that I've known Mr. Mumina and worked with him, he has been ultimately honest, trustworthy in every situation, in every regard, with me....
Q And do you have any fear that he has not rehabilitated himself and does not meet the standards necessary for reinstatement?

A Absolutely not. I have watched him one on one and worked directly with him for five years and he has shown me that he has fitness, the oral character and the competency, if he's reinstated into this Bar, to practice law and serve our community...."

**29.** Transcript of Reinstatement Hearing, April 2, 2009, Tom Creekmore testifying in pertinent part at:

p. 311 "... Q And at that time, were you familiar with his legal abilities?
A Oh, I became aware of them. Mr. Mumina is one of the finer lawyers I ever practiced with or against...."
p. 313 "Q And you had an opportunity, both prior to Mr. Mumina joining Hall Estill and during his tenure at Hall Estill, to observe his legal skills and abilities, how would you describe them?
A Kwame was the complete package. Some lawyers are good at one thing and some are good at another and some at—Kwame was good at everything. He was extraordinarily bright. He was as gifted on his feet in front of a judge as I—I thought he was at the very top of his game there. I thought he was excellent at analyzing the law and applying it, but he was a great strategist...."

**30.** Transcript of Reinstatement Hearing, April 2, 2009, Will R. Burkett testifying in pertinent part at pp. 356–57:

"... Q And the behavior that you're talking about, did that appear to be out of character for him, based upon what you knew of him when he was hired at Hall Estill?
A Yes, I would agree with that....
Q You can't speak to his present fitness, based upon your personal knowledge in the last ten years, can you?
A I can't speak about his circumstances or what's happened to him in the last ten years, I cannot...."

**31.** Transcript of Reinstatement Hearing, April 2, 2009, Gary Rife testifying in pertinent part at p. 370:

¶ 14 We do not ignore either the serious nature of Mumina's transgressions or the steep hill he must climb before he may be considered for reinstatement. All that is required of a first-time applicant is that the individual show that he or she has "good moral character, due respect for the law, and fitness to practice law" without any demand of proof of the same.[32] When viewed in its entirety, the evidence goes well beyond those requirements and is clear and convincing[33] in support of the attorney's present moral fitness to return to the practice of law in Oklahoma.[34]

### 2) Mumina's consciousness of his wrongful conduct, the disrepute his actions brought upon the legal profession, and the attorney's rehabilitation.

¶ 15 The basis of the Bar Association's allegations that Mumina has not taken full responsibility for his wrongdoing appears

> "... Q And again, Mr. Rife, in that respect, you don't have a personal opinion with respect to Mr. Mumina; is that correct?
> A As to his—
> Q As to his reinstatement.
> A No, sir, I do not have an opinion and I—if I did, I'm not sure it would be appropriate for me to express it because my role was to act as an advisor to Hall Estill and that was the only reason I had any knowledge about this entire episode was through confidential or privileged communications with my client and it would be impossible for me to say anything without confusing the issue of whether I'm saying that on behalf of Hall Estill or saying it on my own behalf...."

32. Rule 1, Rules Governing Admission to the Practice of Law, 5 O.S.2001, Ch. 1, App. 5; *Matter of Reinstatement of Jones*, 2009 OK 1, 203 P.3d 909; *Matter of Reinstatement of Jones*, see note 12, supra.

33. Clear and convincing evidence warranting reinstatement to the bar is that measure or degree of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Matter of Reinstatement of Massey*, see note 1, supra; *In re Reinstatement of Pacenza* (*Pacenza II* ), 2009 OK 9, fn. 37, 204 P.3d 58.

34. Evidence of rehabilitation lends itself to a decision allowing reinstatement. *Matter of Reinstatement of Wright*, 1995 OK 128, ¶ 19, 907 P.2d 1060.

35. Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Kumina testifying in pertinent part at p. 193:

to center on the attorney having testified about certain "stressors" which were taking place at the time he committed his transgressions. Those instances include his wife being diagnosed with a life-threatening illness and losing her job, feeling disappointed with his compensation package at the firm, and his child having attempted suicide because she did not have adequate attention from him in his role as a parent. At the same time, Mumina was attempting to finance a play, with monies from the bankruptcy estate of a nursing home, to save it from closing and the residents being relocated.[35]

¶ 16 The attorney did state that he believed all these factors had some impact on his actions. Nevertheless, when questioned about the monies taken from his firm and in his position as a trustee in bankruptcy, Mumina freely admitted that there was "nothing right" about him having taken the funds.[36]

> "... Q Okay. What did you do with those monies that resulted in the federal indictment?
> A At that point, I was—I was wanting to get the nursing home. I still had it in the back of my mind that there ought to be—you know, this was a nursing home in the minority community and I didn't want it to become a chain of nursing homes, because I had been there working at that facility and I became very, very concerned about the care and the treatment of the residents and I had, in the back of my mind, that, you know, at some point, we ought to get this nursing home and that stayed with me.
> And so after the plan had failed and there was a period of probably two years where basically there was nothing going on. It was simply money sitting there and at some point, based upon my zealousness in terms of wanting to get the nursing home and having this thought that I could get it done, I took money from that account and I used it to fund a play that had come to me from California and I used it for those purposes basically...."

36. Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Kumina testifying in pertinent part at pp. 193–95:

> "... Q Okay. What did you do with those monies that resulted in the federal indictment?
> A ... And so after the plan had failed and there was a period of probably two years where basically there was nothing going on. It was simply money sitting there and at some point, based upon my zealousness in terms of wanting to get the nursing home and having this thought that I could get it done, I took money from that account and I used it to fund

He stated that he breached a fiduciary duty and all trust with the firm when he took client monies as his own, that there was "no doubt" that he had done so.[37] When asked why he pled guilty to the indictment in federal court, he responded that he did so because he "was guilty."[38] Although making full restitution will not necessarily preclude disbarment or insure reinstatement,[39] another factor which indicates the attorney's consciousness of the wrongfulness of his conduct is his restitution to the law firm and in the bankruptcy proceedings.[40]

¶ 17 Mumina understands the extent to which his actions harmed the legal profession and he is shamed by his misconduct.[41] While under suspension, Mumina spent time with law students and young attorneys. He spoke

---

a play that had come to me from California and I used it for those purposes basically. Q And looking aback on that now, what was wrong with that?
A Everything was wrong with that. There's nothing right about it. I guess that's my way of putting it. You know, I—I have no basis to justify doing that, other than my own personal circumstances. There was nothing—I can't—I can't begin to fathom anyone saying that that was the proper thing to do. It was not and I certainly will never say that.
Q What about the funds to Hall Estill? It appears Mr. Ralph Plotner was involved in that and we've heard testimony that—I believe that—well, why don't you explain what happened with the Ralph Plotner incident with Hall Estill?
A Well, as I said, Mr. Plotner was a client that I had represented.... [W]e were successful in recovering something like half a million dollars.
Then on the evening of that victory or the day after, Mr. Plotner and I had dinner and we were basically celebrating and during the course of that celebration, involving food and drink and his family were there, a check was given to me for about $3300—$33,000 and my understanding, from Mr. Plotner at the time, was that the check was to me and he said to me, and I still remember him saying to me, do what you want to do with it. That rings in my ear to this day and I did. And I should not have. I should not have, one, allowed Mr. Plotner to give me the money and not report it to the firm.
Q Was that money a retainer for the firm? He argued later on it was a retainer for the firm.
A ... It should have been dealt with in the fashion as any other monies and it wasn't and that was—that was wrong....."

**37.** Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Mumina testifying in pertinent part at p. 238:

"... Q Do you feel that you breached that trust?
A Of course. I think I admitted—if I can't be any clearer to the Panel, when—when one does what I did, you breached—you breached the trust. I don't think there's any doubt about that. I don't think there could be any doubt about it and I would be the first to admit it. I

don't know how it could be any clearer on something like that...."

**38.** Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Mumina testifying in pertinent part at p. 201:

"Q You were subsequently indicted in federal court and were charged with filing—I guess you pled to filing a false trustee's report, is that correct?
A That's very correct.
Q And you—why did you plead?
A Well, because it was—I was guilty. I mean, you know, it was—you know, the facts were that—that I—you know, I took actions and conduct that was wrong. I knew it was wrong. I know it to be wrong today. And at some point, you—I think a part of the process of dealing with something internal is the recognition of the problem, recognition that there was something that went wrong and—and so, you know it was the appropriate thing to do. There was no sense in—there was nothing to challenge...."

**39.** *Matter of Reinstatement of Otis,* see note 1, supra. However, we will be concerned about the moral character of an attorney, who seeks reinstatement to the practice of law, who has not, during the period of discipline, made full restitution of all funds misappropriated or wrongfully withheld from the client. *Matter of Reinstatement of Kamins,* see note 13, supra.

**40.** *Reinstatement of Pate II,* 2008 OK 24, ¶ 15, 184 P.3d 528.

**41.** Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Mumina testifying in pertinent part at p. 264:

"... THE WITNESS: I think it's a bad idea. You know, it's funny you ask that because, you know-you know, I take the practice of law very—very seriously. I honestly, honestly do, and it's—it's a wonderful profession. It's an honor and, you know what—I was involved in the Bar in ways that I think a lot of people looked up to and held—and I hold it in honor and so I am—I'm ashamed. I've stepped back from myself and say how could you? I will speak to myself as if I would speak to a third party and say how could you—how could you

of his downfall and what he believed to be the cause of his actions and how he would suggest that the individuals avoid the pitfalls he faced. The attorney explained that he waited an extensive period of time before requesting reinstatement because he wanted to be certain that the factors he rationalized as a basis for his actions were no longer present in his life or were under control.[42]

¶ 18 The evidence demonstrates that Kumina realizes that his actions were wrong. He has taken full responsibility for those actions. The attorney has made full restitution to the law firm and in the bankruptcy proceedings. Rather than stand trial for an offense he knew he committed, he pled guilty and served his sentence in a federal facility. The attorney waited an extended period of time before attempting to be reinstated and worked on ensuring that he would not place himself in a position to commit similar acts in the future. He explained his downfall to those entering the legal profession in an attempt to help them to avoid similar pitfalls. All these factors combine to convince this Court that Kumina demonstrated consciousness of his wrongful conduct and the disrepute it brought upon the profession and that he has provided evidence of his rehabilitation.

### 3) The severity of the attorney's misconduct does not prevent reinstatement.

■■ ¶ 19 Multiple witnesses testified that they would be ready and willing to employ

Kumina as their personal legal counsel. It was emphasized that the attorney's return to the practice of law was important to the community within which he is active. Kumina's aberrant behavior spanned a period of about fifteen months during a time period when relationships were not healthy either in his working environment or on the home front. The attorney did not seek reinstatement until well after the time period when he would have been eligible to file such a petition because he was aware than he needed to remove some stressors from his life and learn to handle others. He has made complete restitution to both entities involved in his misappropriation activities and is making every effort to satisfy his delinquent taxes. Kumina has worked with young lawyers in an attempt to instruct them on how to avoid the situation in which he found himself. He is repentant for his wrongdoing and embarrassed for the disrepute he has brought on his profession.

¶ 20 There is absolutely no evidence that the attorney has engaged in any activity since his resignation which would adversely reflect on his ability to return to the practice of law, including the unauthorized practice of law while under suspension. There is ample evidence indicating that Kumina has remained competent through acting as a paralegal, reading Bar Journals, and participating in Continuing Legal Education Courses.

■■■ ¶ 21 The more severe the offense the heavier the burden the applicant must

---

shame this wonderful profession as you did? . . ."

**42.** Transcript of Reinstatement Hearing, April 2, 2009, Kwame Telli Mumina testifying in pertinent part:
at pp. 211–12 ". . . Q Why have you sought reinstatement at this time. You resigned in '97 and you finished your sentence and I believe supervision in—was it 2002?
A I believe so.
Q Why did you wait so long to petition for reinstatement?
A Well, again, I think it's a process. I know I was eligible quite a while ago, but I don't think it's a matter of statutorily saying that you should do—or you can do it at some point. I think that—that each individual lawyer, former lawyer, has to make a personal decision about when they're ready, and that was a process that I was going through and I knew what had

happened. I knew what had gone on and I loved practicing law. I love helping clients and I wanted to make sure that if—if I was given the privilege ever to practice law, that whatever occurred back then, I was over, done, through, and it wouldn't become a threat to me doing anything like that ever again. . . ."
at p. 216–17: ". . . And so part of my therapy was to tell these guys, these young men, these potential lawyers, that there are some things you ought to be looking out for that—things happen that, you know, you do that, you know, you ought not do and you ought to be conscious of the signals and the warning signs and the anxiety that go on, so that you don't fall into the trap that I fell into. And so it was—it was very, very helpful to me to tell them that and I think I knew then that, you know, I had done something special in a way and I was telling myself that I was—I was not ready—I'm moving in that di-

overcome to gain reinstatement. However, each application for reinstatement must be considered on its own merits. It will fail or succeed on the evidence presented and the circumstances of the attorney's case.[43] Furthermore, a lawyer's commission of a felony or other grave misconduct is not an insurmountable barrier to reinstatement.[44]

¶ 22 Our primary duty is to protect the public, the judiciary and the legal profession. Therefore, we take our responsibility of passing on an application seeking reinstatement for one who has previously failed to meet the profession's standards with utmost seriousness.[45] Before reinstating an attorney to the Bar Association, the Supreme Court must have a firm conviction that the lawyer will not engage in similar misconduct.[46] Even considering the testimony of the three attorneys opposing reinstatement, the quality and quantity of evidence in favor of reinstatement convinces us that Kumina will provide, once again, valuable services to clients, the practicing bar, the judiciary, and his community.

## CONCLUSION

 ¶ 23 Under the particular evidentiary facts and circumstances in this matter, we find the Bar Association's opposition to reinstatement unwarranted and agree with the trial panel's unanimous recommendation of reinstatement. Members of the judiciary and the practicing bar have placed faith in

Mumina's ability to contribute to the legal profession, the judiciary, and his local community. We trust that we will not be faced with the unpleasant task of reviewing any future allegations of misconduct.

¶ 24 Upon a *de novo* review,[47] we grant the attorney's application, supported by clear and convincing evidence.[48] Reinstatement is conditioned upon the attorney's payment of $2,796.78 in costs of the proceeding.[49]

## PETITION FOR REINSTATEMENT GRANTED; PETITIONER ORDERED TO PAY COSTS OF $2,796.78.

EDMONDSON, C.J., HARGRAVE, OPALA, KAUGER, WATT, COLBERT, REIF, JJ. concur.

TAYLOR, V.C.J. and WINCHESTER, J. dissent.

TAYLOR, V.C.J., dissents:

I dissent to the reinstatement of the Respondent. He is a thief. He stole over $50,000.00 from his law firm and actively attempted to conceal the theft. He was a court-appointed trustee and stole over $100,000.00 from a bankruptcy estate. He is a convicted felon. He made restitution and apology *only* after being discovered and confronted.

---

rection and felt—felt good about it at that point...."

**43.** *Matter of Reinstatement of Jones II*, see note 18, supra.

**44.** *Matter of Reinstatement of Seelye*, 2005 OK 34, ¶ 4, 115 P.3d 836; *Matter of Reinstatement of Anderson*, see note 23, supra; *Matter of Reinstatement of Page*, see note 23, supra; *Matter of Reinstatement of Hird*, 2008 OK 25, 184 P.3d 535; Reinstatement granted in the following cases: *Matter of Reinstatement of Johnston*, 2007 OK 46, ¶ 13, 162 P.3d 922 [Attorney convicted of misdemeanor account of attempting to possess a steroid and four felony counts related to the distribution of illegal drugs.]; *Matter of Reinstatement of Blevins*, see note 1, supra [Attorney pled guilty to state felony charge.]; *Matter of Reinstatement of Gassaway*, 2002 OK 48, ¶ 5, 48 P.3d 805 [Attorney served sentence for making a false statement on a tax return.]; *Matter of Reinstatement Wright*, see note 34, supra [Attorney convicted of felony cocaine distribution charge.]; *State ex rel. Oklahoma Bar Ass'n v. Samara*, 1989 OK 80, ¶ 10,

775 P.2d 806 [Attorney convicted of felony involving income tax evasion.].

**45.** *Matter of Reinstatement of Jones II*, see note 18, supra.

**46.** *Matter of Reinstatement of Otis*, see note 1, supra; *Matter of Reinstatement of Massey*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2003 OK 56, ¶ 24, 71 P.3d 18.

**47.** *In re Reinstatement of Otis*, see note 1, supra; *In re Reinstatement of Massey*, see note 1, supra; *Matter of Reinstatement of Blevins*, see note 1, supra.

**48.** Rule 11.4, Rules Governing Disciplinary Proceedings, see note 2, supra; *Matter of Reinstatement of Katz*, see note 2, supra.

**49.** Rule 11.1, Rules Governing Disciplinary Proceedings, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Pacenza (Pacenza I )*, see note 3, supra.

The Respondent does not meet, by clear and convincing evidence, the very strict test set out in Rule 11.4 RGDP which requires that "An applicant seeking such reinstatement will be required to present **stronger** proof of qualifications than one seeking admission for the first time." (emphasis added) If today, with his record, he was seeking admission to the Bar for the first time he would certainly, absolutely and rightfully be denied.

This Court has a primary obligation to safeguard the interests of the public and to protect the integrity of the legal profession. If Rule 11.4 RGDP is to have any meaningful enforcement at all, this Respondent's application for reinstatement must be denied. His qualifications are **not** stronger than anyone seeking admission for the first time. No first-time applicant with the Respondent's record would be admitted to the Oklahoma Bar Association. That is the standard required by the RGDP and it has not been followed in this case.