2015 OK 70

**In the Matter of the REINSTATEMENT OF Kenneth L. HIRD, to Membership in the Oklahoma Bar Association and to the Roll of Attorneys.**

**SCBD No. 6176.**

Supreme Court of Oklahoma.

Oct. 27, 2015.

Richard D. White, Jr., Tulsa, Oklahoma, for Petitioner.

Loraine Dillinder Farabow, First Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Respondent.

## OPINION

WATT, Justice:

¶ 1 This is the third petition filed by the petitioner, Kenneth L. Hird, for reinstatement of his membership to the Oklahoma Bar Association (OBA), pursuant to Rule 11, Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2011, Ch. 1, App. 1–A. He was previously denied reinstatement by this Court on March 20, 2001,[1] and on March 25, 2008.[2] His most recent petition was filed on September 23, 2014. Following a hearing before the Professional Responsibility Tribunal (PRT) on December 19, 2014, the PRT filed its report in this Court on February 26, 2015, denying Hird's latest petition by a vote of 2–1. This proceeding followed. The OBA is in favor of Hird's reinstatement.

## BACKGROUND

¶ 2 While serving as a lending officer and manager for Caprock Savings and Loan in Dallas, Texas, Hird was involved in a fraudulent scheme which eventually led to the demise of the company. He personally financially benefitted from the fraud, which allowed him and his family to live a lavish lifestyle. The fraud was eventually discovered, and he was prosecuted by the federal government. He pleaded guilty to charges of bank fraud and money laundering and served prison time at the federal prison in El Paso, Texas.[3]

---

1. *In the Matter of the Reinstatement of Kenneth L. Hird ("Hird I ")*, 2001 OK 28, 21 P.3d 1043.

2. *In the Matter of the Reinstatement of Kenneth L. Hird ("Hird II ")*, (2008 OK 25, 184 P.3d 535).

3. The facts of his criminal case are more fully set out in his previous reinstatement proceedings. See notes 1 and 2, supra.

## STANDARD OF REVIEW AND JURISDICTION

¶ 3 It is this Court's nondelegable, constitutional responsibility to regulate the practice, ethics, licensure, and discipline of practitioners of the law. *Matter of Reinstatement of Kerr,* 2015 OK 9, ¶ 6, 345 P.3d 1118, 1121. In bar reinstatement proceedings, this Court exercises its original and exclusive jurisdiction and applies a *de novo* standard of review. *Kerr,* 2015 OK 9, ¶ 6, 345 P.3d at 1121; *Matter of Reinstatement of Pate,* 2008 OK 24, ¶ 3, 184 P.3d 528, 530. The recommendations of the trial panel are merely advisory in nature. *Id.* We are not bound by its findings of fact, its view of the evidence, the credibility of witnesses, or the weight to be given to the evidence. *Kerr,* 2015 OK 9, ¶ 6, 345 P.3d at 1121.

¶ 4 Under the requirements of RGDP Rule 11.5, 5 O.S. 2011, Ch. 1, App. 1–A, the Trial Panel is required to make specific findings regarding whether the petitioner for reinstatement: 1) possesses the good moral character which would entitle the lawyer to be admitted to the Bar; 2) has engaged in the unauthorized practice of law during the period of suspension; and 3) possesses the competency and learning in the law required for admission to the practice of law in Oklahoma. Additionally, the Court considers eight other factors in making a reinstatement decision: 1) applicant's present moral fitness; 2) demonstrated consciousness of the conduct's wrongfulness and the disrepute it has brought upon the legal profession; 3) the extent of rehabilitation; 4) the original misconduct's seriousness; 5) conduct after resignation; 6) time elapsed since the resignation; 7) applicant's character, maturity and experience at the time of resignation; and 8) present legal competence. *Matter of Reinstatement of Kerr,* 2015 OK 9, ¶ 8,

345 P.3d 1118, 1122; *In re Reinstatement of Massey,* 2006 OK 21, ¶ 12, 136 P.3d 610, 614.

## REPORT OF THE TRIAL PANEL

¶ 5 The Report of the Trial Panel contained the findings that Hird did not establish by clear and convincing evidence:

(1) that he has competency and learning in the law;

(2) that he presented stronger proof of qualifications than one seeking admission for the first time; and

(3) that he possesses good moral character sufficient to entitle him to be reinstated.[4]

¶ 6 In its summary, the Tribunal states that Hird relies on much of the same evidence to establish competency and learning of the law which was considered by the Court in Hird II, in which his request for reinstatement was denied. At that time, this Court found he failed to establish by clear and convincing evidence that he possessed the requisite competency and learning for admission to the Bar. The Panel finds that he again relies on his work as a paralegal, his human resources work, and his experience as an oil and gas landman. However, the Panel did note that in this reinstatement proceeding, Petitioner presented evidence of completing three online Continuing Legal Education (CLE) courses, two in 2013 and one in 2014. The Panel also made the statement that "[s]ince the prior denial of reinstatement in 2008, no additional evidence of attempts to maintain legal competency was presented until the completion of the CLE in 2014." Because of the great lapse of time since his resignation, over 20 years, the Panel concluded he had failed to show he had kept himself informed as to "current developments in the law sufficient to maintain his competency," citing Rule 11.5, RGDP.

---

4. Specifically, the Report of the Trial Panel provides, in part:

11. Tribunal **FINDS** that Petitioner has failed to establish, by clear and convincing evidence, that the Petitioner possesses the competency and learning in the law required for admission to practice law in the State of Oklahoma.
12. Tribunal further **FINDS** that Petitioner has failed to establish, by clear and convincing

evidence, that he has stronger proof of qualifications than one seeking admission for the first time.
13. Tribunal further **FINDS** that Petitioner has failed to demonstrate, by clear and convincing evidence, that he possesses good moral character to entitle him to be reinstated to the Oklahoma Bar Association.

¶ 7 The PRT's report in the current proceeding gives emphasis to the fact that Hird's bank fraud and money laundering involved tens of millions of dollars and was committed while acting as general counsel of the savings and loan. It also noted that his criminal conduct created financial harm to many individuals. Despite noting compelling evidence that he has been rehabilitated "to a significant degree" and that he is a productive member of society, however, the PRT stated in its Report recommending denial of reinstatement:

> Neither the lapse of time nor the commendable conduct over time is sufficient to overcome the serious nature of Petitioner's crimes. *Matter of Reinstatement of Page*, 2004 OK 49, ¶ 19, 94 P.3d 80, 86.[5]

¶ 8 The PRT contrasts this case with *Matter of Reinstatement of Mumina*, 2009 OK 76, 225 P.3d 804, cited by the OBA, in which reinstatement was granted. Although the PRT notes the similarities, i.e., commission of felonies involving money and federal prison time, it appears to place more emphasis on the fact that restitution was made by Mumina, but not by Hird. It should be noted, however, that the charges of misappropriation and embezzlement were dismissed as part of a plea negotiation **after** Mumina paid restitution to a bankruptcy estate. *Mumina*, 225 P.3d at 808, ¶ 5. He was further ordered to pay restitution of $35,425.73, which he did. *Id.* Hird's sentence was modified, upon motion of the government pursuant to 18 U.S.C. § 3663(d), because of Hird's substantial assistance in the case.[6] He was, therefore, **not** ordered to pay restitution. This Court should not be understood to hold that the commission of any crime by a lawyer should be treated as anything other than a serious matter. However, we are called upon in this case to determine whether the seriousness of Hird's original misconduct should continue to remain an obstacle to his current quest for reinstatement.

¶ 9 The commission of a felony is not an insurmountable barrier to reinstatement. *Matter of Reinstatement of Kerr*, 2015 OK 9, ¶ 19, 345 P.3d 1118, 1125–1126. Additionally, each application must be considered on its own merits and will fail or succeed on the evidence presented. *Id.* The more severe the offense, the heavier the burden to overcome. *Id.* We decline to hold that his original misconduct should prevent his reinstatement.

## COMPETENCE AND LEARNING IN THE LAW

¶ 10 We have carefully reviewed the record and find that Hird's conduct, since the denial of his last request for reinstatement, shows that he has taken steps to keep himself current in the law. Moreover, the nature of the work he has done has required an understanding of the law in specific areas:

a. He testified that his current employment is an oil and gas landman. He would like to do oil and gas title work because it is his area of "great expertise at this time." As a landman, he is technically self-employed, but now works primarily for Paladin Land Group in Tulsa. PRT Trans., p. 204.

b. He testified he has a "very good grasp" on most employment matters, having been in Human Resources for a number of years. The company he previously worked for had 1000 employees and was never sued. The company had to pay employment attorneys to do the legal work which he was prohibited from doing. However, he maintained an intimate knowledge of the Family Medical Leave Act, unemployment law, termination law, and various Veterans's acts. Although much of that experience was prior to the 2008 denial of reinstatement, he gained other business experience when he and four others started a company in 2009. He described it as an "architectural, woodwork fixture company" named Bearwood Con-

---

**5.** Page received federal felony convictions for multiple instances of accepting bribes or conspiring to accept bribes in return for interference in pending criminal investigations and litigation in his capacity as both a prosecutor and a judge. *Page*, 2004 OK 49, ¶ 16, 94 P.3d at 85–86.

**6.** See Record, Exhibit 1A, Joint Exhibit Notebook.

cepts. He helped facilitate the financing by presenting a lending package to different banks when the company got started. After initially receiving a negative response from several lenders, BancFirst responded favorably. Hird made BancFirst aware of his criminal conviction, but stated the bank was fully confident, loaning $1million. After five years, the company had 150 employees and revenue of over $10 million. At that time, his partners bought his shares, and he left the company in February, 2014, just months before the PRT hearing in this case. PRT Trans., p. 183, 204.

c. In addition to his landman work, he testified he had recently done some legal work for his attorney, Mr. White. He wanted to help him because of the enormous amount of legal work White had done for him. He performed legal research and analysis in a lawsuit involving the collection of a judgment against a school district. In addition to research, he helped prepare a pleading and a response on a pending motion for summary judgment. PRT Trans., p. 235.

d. As to CLE's since 2008, he noted he took two online courses in 2013 and one in 2014, mentioned above. The total number of hours was: 12 hours, plus 1 hour of ethics in 2013 in oil and gas law; and 6 hours with no ethics' hours in 2014 in environmental law. He admitted there were no others since the 2008 hearing. PRT Trans., p. 234.

## MORAL CHARACTER AND FITNESS TO PRACTICE LAW

¶ 11 Hird was asked about his priorities today. He answered that his faith and his family are his two biggest priorities. He described himself as a very blessed man, with a wife of almost 20 years and three sons. Even during his early days as a land man which required travel, he arranged to have at least four long days at home each weekend to allow for normal evenings with his family before leaving again on Sunday. He described his family as a "high priority now."

¶ 12 At the OBA's request, he spoke with attorneys who were going through disciplinary proceedings, in danger of losing their licenses for misconduct. He explained what he had been through. He also talked to them about admitting what they did wrong and to do everything they could to rebuild their lives honestly. He explained they may never be rich, but they could have very fulfilled lives and help others. He feels he has a fulfilled life today.

¶ 13 Hird testified that if he is given the opportunity to practice law, he will be able to do things to help people who can't help themselves. He explained that a homeless woman who wandered into his church calls him from time to time needing help. For the past ten to eleven years, he has helped her with food and, occasionally, money for shelter, when the temperature outside is frigid. He has taken her to the emergency room and provided transportation. The superintendent of Wright Christian Academy, where his youngest son attends school, allowed her to use the school's address to receive mail. Hird helped her obtain food stamps, SSI and social security disability, which has made her become more independent. He has become her friend and said that "it's important for everyone to know they've got at least a friend or two and she knows she has got a friend or two." PRT Trans., p. 203.

¶ 14 Hird testified he believes he has gained maturity and wisdom to know he can't do every kind of law. He knows when to say "no" when he is not competent in a certain area. Now, he would refer such a case to another lawyer with expertise in that area rather than assume the role himself. He said:

I am old enough, mature enough, wise enough to know that I cannot do everything. When I was a young lawyer and just graduated from law school and went out and had a partner ... I would have taken anything that came in the door.

I will be a much better lawyer today. I will be a much more competent lawyer today. I know I have forgotten a lot but I know a lot more about what the practice of

law is all about and what people would need and I would know when to say no. PRT Trans., p. 206.

¶ 15 Additional new evidence in this reinstatement proceeding as to Hird's character and fitness came from the testimony of his former wife, Lisa Ferguson Jayne. She described their marriage at the time of his criminal offense and the events leading to it. Following law school and while living in Tulsa, Hird did not make much money in his law practice. She stated that when they decided to move to Dallas, she thinks Hird was feeling pressure from her because she wanted to have children and be a stay-at-home mom. Things greatly improved financially when they moved to Dallas, but she and Hird grew apart. She was happy because she had children, but he kept many things from her, probably to avoid disappointing her. She doesn't remember him saying "no" to her very often. She really had no idea that they had almost filed bankruptcy. She concentrated on raising their two children.

¶ 16 Their lifestyle continued to be more and more lavish with the acquisition of a mansion, which she described as "ostentatious," and expensive cars. One day he came to her and told her they would be bankrupt in six months. He hadn't previously told her because he thought he could work out the situation and she wouldn't have to know and be disappointed. He also told her the savings and loan was under investigation and that he was leaving Caprock. They eventually moved back to Tulsa. Their attempts to buy a home fell through, and they learned Hird was being investigated by the FBI. They lost everything. At that time, she said she hated him.

¶ 17 She described the difficulty for her and their two children during Hird's federal prosecution and his incarceration. She filed for divorce while he was in prison. When he was released, she was guarded about his visitation with their sons. Eventually, however, she allowed him more time with them and trusted him.

¶ 18 After his release from prison, Hird spent a lot of time with their sons and was a good dad. She said they "love him to death." Over time she started seeing changes in him.

He was humbled and was happy to be back and to have a relationship with his kids. She felt he must have realized what he did affected all of them, and she started softening up a bit and saw that he had changed. He got married, had a stable home, and she helped him and his wife adopt a child. She stated she felt he was again the person she first met and that he had come back to what was really important. He participated in their sons' school and sports activities. Over time, she could tell he was changed. He donated time to charities the boys were involved in. Over the last 10 years, she and Hird have been communicating and actually spent Christmas at his house with their children. She stated it was "absolutely not true" that his change was merely superficial to obtain his law license again. She said he has changed because he finally could see what he had lost, "and it wasn't a house, you know." She was asked why she came to the hearing to testify:

Well, I feel it's justified. I feel like he deserves it back. I think he has fought for it and I think he has changed. And I think he has realized the severity of what was lost and what was wrong, what he did wrong and how he was stupid honestly.

But I think he—I've just watched him over the years and through his businesses and he has had some ups and downs but he has never complained. The boys have never come back feeling sorry for him. He just picks himself up and starts over the next day.

And I know that whatever he does he is helpful to other people and he is kind and he has used his story. I have used his story to tell people, to warn people.

If you had ever told me that he'd got (sic) caught up in power and greed I would have laughed. I would have—he was a goodie two-shoes. That's why I liked him because I wasn't and I was like, well, maybe he will make me that way.

I admired him. He did the things that I wanted—that my dad was like. And then when I saw all of that dissipate it was great to see it return again.

He is a good example for my boys as grown men now. They know they can mess up. They know it can happen to anybody, that we are human.

And I think that honestly he could do some good works with it, I really do, or I wouldn't be here. I could be working seriously.

I mean, I would—in fact, my son called to ask me and I said "In a minute. I'll do it in a minute." PRT Trans., pp. 117–118.

¶ 19 When Hird called her to ask her to testify, she said, " 'I'll save you the grief of explaining it to me. I already said I would do it. I am happy to testify for you.' I'm proud of him now. I am proud of the way he has gone through. I don't know how he made it through the whole thing but I am proud of him that he has done it."

¶ 20 Other witnesses at the PRT hearing spoke of Hird's character and how this experience has changed his life. Paul Thomas, a lawyer in the office of U.S. Bankruptcy Trustee for the Northern and Eastern Districts of Oklahoma, testified. He is also Hird's brother-in-law, married to Hird's sister. He contrasted Hird's lifestyle in Tulsa with it in Dallas and said it went from very modest to opulent. He first met him at church in Tulsa. He testified that if Hird's license were reinstated, he believed he would not go outside areas of law practice in which he was not proficient. Conceding that a license to practice law is not restricted to certain areas, he stated he believed that because of Hird's life experiences, in business and otherwise, that Hird would not go into areas in which he was not fully prepared. Asked if Hird has maintained his competency in the law and understanding of recent developments, Thomas answered, "not across all practice areas, but yes. I would say, yes." He also stated that Hird is different now personally and professionally, in that his focus has changed from "things" to "relationships" which makes all the difference. He further stated:

And so it's not about—it's not about the deal that he can make, even if he is representing somebody that needs him to represent them on a big deal. It's not about the deal anymore. It's about the relationship and "Can I provide value in this relationship". That's different than "Can I take advantage of this situation to gain personal wealth".

¶ 21 Thomas testified has observed Hird over time and wholeheartedly believes that this change in Hird is genuine.

¶ 22 Another witness, Clarence Mark Schumacher, testified for Hird. He is involved in an organization known as Focal Point, made up of business professionals. The group invites speakers on topics related to the business world and how to bring balance to a person's life. Hird's story was told to the group by his attorney while Hird was present. He was later introduced and came forward to answer questions at the end of the presentation. The group showed great interest and appreciation to Hird who was willing to answer questions. Schumacher stated it was a good reminder to all of them that making compromises can lead to a "downhill slide." Hird seemed remorseful, candid, open and humble. He stated the story seemed "totally out of character" with how he is now. He never tried to justify what he did. He blamed himself, not others. The speaking engagements were not paid. He also said he would "absolutely" trust Hird to handle his assets. He said someone who has been through something like that comes out of it "more trustworthy, more aware of what potential pitfalls are out there" than someone who has not been there before. He said the consensus of the group was that Hird showed openness and an obvious change of heart, although admitting that his former employer, Northern Trust Company, in Chicago would "probably not" hire someone who had been convicted of money laundering while working with a savings and loan company.

¶ 23 Another friend, James Lawrence, testified about the change in Hird after he got out of prison and was looking for work. He described him as very humble and very penitent. He never complained about the prison time but was glad to be out and for the chance to be hired for a job. He had a heart for helping people before going to Dallas, and Lawrence sees that in him today. He never talks about being wealthy, only the desire to make a comfortable living for his family, raising his kids and being honorable

in what he does. He performed manual labor willingly. He was thrilled to be working and that someone would hire him, despite his criminal record. He never saw him feel sorry for himself.

¶24 Jeff Brown, the Superintendent of Wright Christian Academy, also testified. He asked Hird to be on the board of the school his youngest son attended. He and the other board members interviewed him and found he could contribute positively as a board member. With a child still at the academy, he provides a perspective of what is going on in the school while providing direction of where they wanted it to go as a ministry. The board was aware of his criminal record. His service to the board has been very good. Brown spoke of the homeless woman Alyse who came to their church for help. He said Hird "has been the primary resource for her," although she calls both of them when she needs help. He spoke of Hird's help to her with Social Security, a trip to the hospital, and a "psych evaluation" for receiving disability income. She got a Social Security card through his help which took a lot of patience on his part. They think of her as their friend, and he thinks it has been Hird's honor "to do the best he can by her."

¶25 The testimony presented indicates Hird has experienced a change of heart about how we now intends to practice law. He is no longer motivated by wealth and prestige as his ultimate goals. He wants to provide for his family, but he wants to do it honestly and ethically. He wants his family's well-being, as well as their trust and confidence in him. The testimony presented indicates he has worked diligently to restore this trust and that he is aware of what is now at stake if he should abandon his new work ethic. He blames no one but himself for his prior shortcomings.

¶26 He wants to practice law in his current area of expertise, i.e., oil and gas title work. His more recent business experience as an owner of Bearwood Concepts shows he had to have known sufficient employment law to have a successful company with 150 employees. He wants to help people who can't help themselves, but who need assistance in legal matters. He now knows when to turn down a case in an area in which he lacks experience and knowledge.

## APPLICATION FOR COSTS

¶27 The Bar filed its Application to Assess Costs for reimbursement of its costs in this proceeding, pursuant to Rule 11.1(c), RGDP, 5 O.S. 2011 Ch. 1, App. 1–A. It requested a total of $1,812.16 for expenses for publication expense, mileage for a trial panel member to travel to the PRT hearing, and costs of the transcript. All of the expenses are allowed, as costs legitimately arising from investigating and processing the application. The application to assess costs is granted.

## CONCLUSION

¶28 This Court finds that Kenneth L. Hird has sustained his burden of proof of compliance with Rule 11, RGDP, for reinstatement of his law license. The PRT's findings that he failed to show he possessed good moral character, competence and learning in the law and that he showed stronger proof of his qualifications on reinstatement are not supported by the evidence presented.

¶29 Within ninety (90) days of the date of this opinion, Hird is directed:

A. to pay the costs of this proceeding in the amount of $1,812.16, pursuant to Rule 11.1(c), 5 O.S. 2011, Ch. 1, App. 1–A.

B. Hird is also directed to complete the remaining six (6) credits for his 2014 MCLE requirements, and to provide proof of completion of twelve (12) credits for 2015, as provided by Rule 3, Continuing Legal Education (CLE Requirement, 5 O.S. 2011, Ch. 1, App. 1–B).

REIF, C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, COLBERT, JJ.—Concur

COMBS, V.C.J., TAYLOR, GURICH, JJ.—Dissent.